## GLASGOW ET AL. *vs.* HORTIZ ET AL.

1. The act of Congress, passed June 13, 1812, confirming to the inhabitants of St. Louis and other villages the lots, out-lots, commonfields, &c., occupied and cultivated by them before 1803, is a present operative grant of all the interest which the United States had in the land mentioned in the act.

2. As no act of the Surveyor General was necessary to make the grant valid, so nothing that he did could defeat it.

3 A map, made by the Surveyor General in 1840, exhibiting the outboundary lines of St. Louis common, is not binding on one who claims under a villager.

4. A title confirmed by the act of 1812 is a good title, though the land be not within the out-boundaries laid down in the Surveyor General's map.

Writ of error to the Supreme Court of Missouri.

This action was commenced in the St. Louis Land Court, by William Milburn, William Glasgow, jr., and William C. Taylor, against Jean Baptiste Hortiz. The petition of the plaintiff set forth that they are commissioners appointed under a law of the State, and as such entitled to the possession of the land described as section sixteen, township forty-five north, range seven east, and the defendants have taken and unlawfully hold about ten acres thereof, for which suit is brought. The defendant answered, admitting his possession of a tract containing 4 22-100 arpents, and denied the plaintiff's right of possession.

On the trial the plaintiffs showed their appointment as commissioners, and their right under the law of Missouri to possession of the sixteenth section. The defendant admitted that the land he was on was part of the sixteenth section, but showed that he held it by a title from François Bequette, who had occupied and cultivated it, claiming it to be his own prior to December 20, 1803; and that it is situated in the vicinity of the ancient village of St. Louis, of which Bequette was an inhabitant.

The defendant asserted that those facts, coupled with the act of Congress passed in 1812, confirming to the inhabitants of St. Louis and other villages such out-lots, common-field lots, and commons, as were inhabited, cultivated, or possessed by them previous to December 20, 1803, gave him a legal title to the land in dispute. To this the plaintiffs replied that a survey of the St. Louis commons, out-lots, &c., was made by the Surveyor General in 1840. He exhibited the map of that survey, and showed that the land occupied by the defendant was not within the out-boundaries there laid down.

The court refused to instruct the jury that the survey was binding upon all parties claiming under the confirmation of 1812, but charged, that if the land in dispute was one of a series of lots lying together in the vicinity of St. Louis village, and used by the inhabitants as a common-field prior to December, 1803—if the land sued for was cultivated by Bequette before that time—if Bequette was an inhabitant of the village—and if his title was vested in the defendant—then the verdict ought to be for the defendant.

The verdict and judgment were in favor of the defendant. The judgment was affirmed in the Supreme Court of the State The plaintiff took this writ of error.

*Mr. Bates*, Attorney General, for plaintiffs in error. It ap pears that the land in question lies outside of the out-boundary as surveyed under the act of 1812, and outside of the limits of the corporation, as designated in 1809; yet the defendant, while this is obvious to the eye upon the map, and admitted upon the record, still insists that the land he claims, though clearly not *within nor adjoining* the town, did, nevertheless, *belong* to the town. If that were so, it was for him to show it. The jury, even, did not find it as a fact. Indeed they could not so find it; for the phrase "*belonging to the town,*" as used in the act of 1812, does not imply *ownership or proprietary right*, but *jurisdiction and governmental control*. Neither did the court find it as matter of law. There is no such finding by court or jury in the case.

This question of out-boundary has never been passed upor

by this court, and never by the Supreme Court of Missouri, except in this very case, as reported in 23 Mo., 532. And so, the supposition of adverse counsel, that this case is covered and controlled by the case of *Guitard* vs. *Stoddard*, (16 How., 507,) is a clear mistake. That case did not touch this question. In that case the question was not of locality—whether within or without the boundary—but a question of the time and manner of proving up the claim. The Circuit Court held that it could not be proven then, at the trial, but that the claimant ought to have made his proof before the recorder, under the act of May 26, 1824. And that was the point upon which this court reversed the judgment of the court below.

As the claimant, to make himself a beneficiary of the act, must needs show himself within the scope of the general grant, which does not name him, nor specify his land, let us consider the necessity of a survey of his private claim.

It is said that the claimants, in these cases of confirmation by the act of 1812, stand in no need of a survey to perfect their title by identifying their lands. I answer, if that be so, it is not because the law does not require in that case, as in all others, special locality and exact boundary, but because there are other easy and convenient means of precise description.

The act grants only *lots*, not large tracts of land—lots in, adjoining, and belonging to towns, not lands in the wilderness—lots to which the persons had a right, title, or claim in Spanish times—lots which were actually inhabited, cultivated, or possessed as long ago as 1803—lots, therefore, capable of definite proof. And if no other law required that proof, the act of May 26, 1824, (4 Stat., 65, Ch. 184,) makes it the duty of every claimant, who seeks to get the recorder's certificate of confirmation, to make proof "of the fact of inhabitation, cultivation, or possession, together with the boundaries and extent" of his claim—(not of his *right, title, or claim,* for that was supposed to be already in the recorder's office, as was the fact in very many cases, proved by the reports of the recorder, which were confirmed by the act of April 29, 1816, Ch. 159.)

Besides, the act of April 29, 1816, Ch. 151, (3 Stat., 325,) after directing the survey of the *public* lands, proceeds to say:

"And also, *it shall be the duty of the surveyor* to cause to be surveyed the lands in the said Territories, the claims to which *have been*, or hereafter *may be*, confirmed by *any act of Congress*, which have not already been surveyed *according to law.*"

From the general tenor of our land laws, it is manifest that the Government intended that all private claims should be surveyed; and this particular act enjoins upon the surveyor to survey *all lands* confirmed, or to be confirmed, *by any act of Congress.* But how can he perform that duty in regard to confirmations of claims which exist only in the secret memories of the claimants and their witnesses—claims which have no record or other written basis, nothing in the public offices to which he can resort for information, and nothing upon the land itself to intimate a confirmation, or even a claim?

The possession of Hortiz of his little scrap,—4.22 arpents—is only coeval with this action, (September 15, 1853,) so far as appears in this record, and yet he claims a confirmation *then* more than forty years old!

The surveyor, as in duty bound, went on, under the said act of 1816, to survey the public lands and such private confirmations as were made known to him. But the claim of Bequette (or Hortiz) was not made known to him, neither by record evidence, nor even oral pretension. He could not, therefore, survey it, for he could not know of its existence. And hence, when, in 1818, (two years after the passage of the act,) he was surveying township forty-five, both public and private lands, he could do no otherwise than treat section sixteen as public land, and survey it accordingly. And it *was* public land—so treated by both the nation and the State; and, therefore, if Bequette ever had any inchoate right to the land, he justly lost it by his laches.

*Mr. Hill* and *Mr. Polk*, of Missouri, for defendants. The survey was not a condition of the grant made by the act of 1812. The confirmation contained in the first section gave a free title, *proprio vigore*, to the inhabitants of the villages. *Vasseur vs. Benton*, (1 Mo., 296;) *Janis vs. Gonno*, (6 Mo., 380;) *Page vs. Scheivel*, (11 Mo., 167;) *Carondelet vs. St. Louis*, (25 Mo.,

460;) *Harrison* vs. *Page*, (16 Mo., 182;) *Kissel* vs. *Schools*, (16 Mo., 553;) *Gamache* vs. *Piquinot*, (17 Mo., 310;) *Soulard* vs. *Clark*, (19 Mo., 583;) *City of St. Louis* vs. *Tony*, (21 Mo., 243;) *Carondelet* vs. *St. Louis*, (24 Mo., 31;) *Guitard* vs. *Stoddard*, (16 How., 494;) *Gamache* vs. *Piquinot*, (16 How., 451;) *Savignac* vs. *Garrison*, (18 How., 136.)

Mr. Justice GRIER. This case depends upon the solution of a single question, touching the construction of the act of Congress of 13th June, 1812, entitled "An act making further provision for settling the claims to land in the Territory of Missouri."

This act declares "that the rights, titles, and claims to town or village lots, out-lots, common-field lots and commons, in, adjoining, and belonging to the several towns and villages, (named in the act, and including St. Louis,) which lots have been inhabited, cultivated, or possessed prior to the 20th of December, 1803, shall be, and they *are hereby, confirmed* to the inhabitants of the respective towns and villages aforesaid, according to their several right or rights in common thereto."

It provides, also, for a survey of the out-boundary lines of the villages, so as to include the common lots and commons thereto respectfully belonging, and donates to the town, for the use of schools, all unappropriated pieces of land within such out-boundary.

Surveys were made of the common-fields called the Barrier de Noyer, the St. Louis common, and a portion of the Cul de Sac field, which were claimed by the village or town of St. Louis as early as 1820, when a township plat was returned. But no map had been constructed, which purported to be a compliance with the duty imposed on the Surveyor General by act, till the year 1840, when the Surveyor General constructed a map, (known in the courts as map X,) exhibiting the out-boundary lines; but for some reason, or by mistake perhaps, the common-fields just mentioned were omitted.

The lots claimed by the several defendants are parts of these excluded common-fields.

The jury have found, in each case, that the lot in question

was a common-field lot of the village of St. Louis; that it was inhabited, cultivated, or possessed prior to the 20th of December, 1803, by the persons under whom the several defendants claim.

Does the admitted fact, that these same commons are not included within the out-boundary map. X, affect the titles claimed under the act?

The term common-field is of American invention, and adopted by Congress to designate small tracts of ground of a peculiar shape, usually from one to three arpents in front by forty in depth, used by the occupants of the French villages for the purposes of cultivation, and protected from the inroads of cattle by a common fence. The peculiar shape of the lot, its contiguity to others of similar shape, and the purposes to which it was applied, constituted it a common-field lot. It could not be confounded with lots or tracts of land of any other character. Under the Spanish and French authorities, that species of trespassers designated by the American term "*squatter*" was wholly unknown. Villagers did not venture to take possession of lots, either for cultivation or inhabitation, without a formal license from the lieutenant governor.

When Congress, in fulfilment of our treaty obligations, came to legislate on the subject of these claims and possessions, they chose to except them from the provisions made by previous enactments, (of 1806 and 1807,) requiring proof of some concession, requéte, or survey, under the former Government, to be submitted to commissioners to have surveys made, and a favorable report by them, before the claims were confirmed. The claims of these old villages to their common-field lots, and the peculiar customs regarding them, were well known. Congress, therefore, did not require that any documentary evidence should be filed, nor a report of commissioners thereon. A survey was considered unnecessary, because the several boundaries of each claimant of a lot, and the extent of his possession, was already marked by boundaries, well known among themselves. They required no record in the land office, to give validity to the title. The act is certainly not drawn with

much regard to technical accuracy. It is without that certainty, as to parties and description of the property granted, which is required in formal conveyances. But a title by statute cannot be thus criticised. It sufficiently describes the lands intended to be granted, and the class of persons to whom it is granted. Besides, it is not a donation, or mere gift, requiring a survey to sever it from other lands of the donor; but, rather, a deed of confirmation to those who are admitted to have just claims. It passes a present title, *proprio vigore*, of the property described to the persons designated; a patent to another afterwards, for any of these lands, would be void, because the Government had already released all title and claim thereto. If Congress could not grant them to another, much less could the arbitrary ·edict, or imperfect performance of a neglected duty by a ministerial officer, operate to divest a clear title by statute.

The construction of this act of 1812 has been so often before the courts of Missouri and this court, that it would be tedious to refer to the cases. The case of *Guitard* vs. *Stoddard* (16 How., 508) need only be cited, as it contains a review of previous decisions.

We there decide, "That the act of 1812 is a present operative grant of all the interest of the United States in the property described in the act; and that the right of the grantee was not dependent on the *factum* of a survey under the Spanish Government. That the act makes no requisition for a concession, survey or permission to settle, cultivate, or possess, or for any location by public authority, as the basis of the right, title, or claim upon which its confirmatory provisions operate. No board was appointed to receive evidence, or authenticate titles, or adjust contradictory pretensions. All these questions were left to be decided by the judicial tribunals."

We have decided, also, that notwithstanding the act of 1824 makes it the duty of claimants to proceed within eighteen months to designate their lots, by proving the fact of inhabitation, and their boundaries and extent, &c., so as to enable the Surveyor General to distinguish the private from the vacant

lots, yet that this act imposes no forfeiture for non-compliance. The confirmee, by a compliance, obtained a recognition of his boundaries; but the Government did not, by that act, impair the effect of the act of 1812.

Now, it is true that this court have not decided directly as to the effect of this map X upon the title to lots excluded by the out-boundaries there traced; but it was only because the question was not involved in the cases decided, and not from any peculiar difficulty in the question itself; for its decision is but a corollary from the principles already established by this court. If our decision be correct, that no act of the Surveyor General was necessary to give validity to the titles confirmed by this act, *a multo fortiori*, it could not operate to defeat them.

The evident purpose and object of this survey of the out-boundary, required by the act, was to distinguish the private from vacant lots, so that the donation of the remnants to the public schools might be ascertained. This duty was neglected by the Government officers for twelve years, when the act of 1824 was passed. At this time, the fences which surrounded these common-fields, and designated their boundaries, had rotted down, and the boundaries were difficult to ascertain. The act of 1824 was an attempt to remedy this long neglected duty of the Surveyor General. But it was found ineffectual; and after sixteen years more have elapsed, and the lots, whose titles were confirmed by the act of 1812, may have descended to the second or third generations, the Surveyor General seems to have waked up to the performance of his duty. It was purely a ministerial function. His neglect could not suspend the vesting of the titles granted, much less his blunders forfeit them. If these verdicts be true, (and we must assume they are,) the Surveyor General has never yet performed the task imposed upon him, of making a survey and map of the out-boundary, including out-lots, common-field lots, &c., belonging to the village, now city, of St. Louis.

The map X may be conclusive, as between the Government and the schools; but as it was not necessary, even if correct,

to confirm the titles under which the defendants claim, its want of correctness cannot now be a reason for their forfeiture. *Judgment of the Supreme Court of Missouri affirmed.** 

---

* Five other cases or writs of error to the Supreme Court of Missouri, all depending on the legal principle solved by this opinion of Mr. Justice *Grier*, were determined at the same time.