## GLASGOW v. BAKER.

ERROR TO THE SUPREME COURT OF THE STATE OF MISSOURI.

No. 40. Argued October 24, 25, 26, 1888. — Decided December 10, 1888.

The act of June 13, 1812, 2 Stat. 748, c. 99, "making further provisions for settling the claims to land in the Territory of Missouri," was a grant *in præsenti* of all the title of the United States to all lands in the Grand Prairie Common Field of St. Louis which had been inhabited, cultivated, or possessed, prior to the treaty with France of April 30, 1803, leaving in them no title to such lands which could pass to the State of Missouri by the act of March 6, 1820, c. 22, 3 Stat. 545, authorizing the people of Missouri Territory to form a constitution and state government, etc.

In ejectment in Missouri, to recover a part of the Grand Prairie Common Field of St. Louis, the plaintiff claiming under the act of Congress of March 6, 1820, c. 22, § 6, subdivision 1, and the defendant claiming under a possession, occupation and cultivation under French law prior to the cession of Louisiana to the United States, it being proved that the land in controversy was either part of that Common Field or had been inhabited, cultivated, or possessed prior to the cession, the defendant is not required to prove with certainty and precision the time when, and the person by whom, the cultivation or occupation was made, but it is sufficient if there is satisfactory proof that according to the terms of the statute, the tract in dispute and all the land within the Grand Prairie Common Field had been inhabited, cultivated, or possessed prior to the year 1803.

THE court stated the case as follows:

The writ of error in this case brings before us for review a judgment of the Supreme Court of the State of Missouri, rendered on the 11th day of May, 1885, in a suit commenced in the St. Louis Land Court of St. Louis County, in that State, on the 15th day of September, 1853.

This suit is in the nature of an action of ejectment to recover possession of about 200 acres of land. It was tried three or four times in the court of original jurisdiction, the last trial resulting in a verdict for fifty-three acres of said land in favor of plaintiff; has been once or twice before the Court of Appeals, a court of intermediate review, and has been three times heard and decided in the Supreme Court of the State of

Missouri. All of the decisions of the latter court have been in favor of the defendants, and the last one is now before us. It is one of a class of cases very numerous, many of which have reached this court, growing out of claims for land which had their inception prior to the treaty of April 30, 1803, 8 Stat. 200, by which the United States obtained the region of country called " Louisiana " from France. Article III of that treaty reads as follows :

"The inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages, and immunities of citizens of the United States ; and in the meantime they shall be maintained and protected in the free enjoyment of their liberty, property, and the religion which they profess." 8 Stat. 202.

This provision for the protection of the rights of private property is probably no more than what follows, by the principles of the law of nations, upon the transfer of the allegiance of the inhabitants of a given territory from one government to another. The city of New Orleans was the principal centre of population of this large extent of country at the time the treaty was made with France, but there were also many villages and towns, generally located along the Mississippi River and upon some of the other navigable streams, and the town of St. Louis seems to have become the largest of these in the northern part of it at the beginning of the century. This territory, known as Louisiana, was for many years the subject of negotiations and contests between the governments of France and Spain. It had been held by the latter power and under its control for some thirty-eight years, when, by the treaty of San Ildefonso, October 1, 1800, it was receded by Spain to France. No actual transfer of possession had been made under this treaty at the time that that of 1803 was ratified, by which we acquired the country from the French government, but formal proceedings were taken immediately thereafter, by which, at New Orleans, possession was delivered to the French official, M. Laussat, on the 30th day of

November, 1803, and on the 20th day of December following this possession was formally passed over to Gen. Wilkinson, representing the United States. Corresponding changes of flags were made at the time at New Orleans, and similar transfers were effected at St. Louis on the 9th and 10th of March, 1804.

The acquisition of titles by individuals to lands from the government, both under the French and Spanish regimes, was of the simplest character. An application to the Governor, who usually resided at New Orleans, or to a Lieutenant-Governor, for leave to cultivate some of the land under his authority, was rarely refused; and, when such an application was rejected, it was generally upon the ground that some previous applicant had a better right. Some of these grants were surveyed and marked out, and the license and survey were considered, when accompanied by possession, to complete the title. Many individuals, however, were in possession of lands under titles which were not perfect, and, when the country came into the control of the United States, it became the purpose and obvious duty of the government to secure to these people all the rights, however imperfect or inchoate, which had been acquired by them under the dominion of either France or Spain. Most of the inhabitants of this territory were French.

The government of the United States performed this duty in the most liberal manner. It commenced by passing an act of Congress in 1805, 2 Stat. 324, c. 26, and a supplement thereto in 1806, 2 Stat. 391, c. 39, which was amended in 1807, 2 Stat. 440, c. 36, by which three commissioners were appointed for the purpose of establishing these land claims and separating them from the public domain. This commission, called the old board to distinguish it from another which succeeded it, made a report of its proceedings to Congress in the year 1811. It rejected a very large proportion of the claims submitted to it, and the hard rules which were applied to the cases brought before it for adjudication occasioned much discontent. A history of the effort to induce Congress to some more liberal provision in regard to them

shows that that body was very fully informed as to the proceedings taken by the commission, and it was upon the representation of at least one of the commissioners, as well as statements of some other persons who were interested in and cognizant of the state of affairs, and upon petitions presented to it, which may be found among the American State Papers, that Congress was induced to pass a much more liberal statute in regard to these claims. It was approved June 13, 1812, 2 Stat. 748, c. 99, and provided for the appointment of another board of commissioners, with authority to re-examine the claims which had been rejected, as well as to investigate others not previously presented, and directed a report to be made to Congress. The first and second sections of this statute, which is supposed to be controlling in regard to the case now before us, reads as follows:

"*An act making further provision for settling the claims to land in the Territory of Missouri.*

"SEC. 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the rights, titles and claims to town or village lots, outlots, common field lots, and commons, in, adjoining, and belonging to the several towns or villages of Portage des Sioux, St. Charles, St. Louis, St. Ferdinand, Villago a Robert, Carondelet, St. Genevieve, New Madrid, New Bourbon, Little Prairie, and Arkansas, in the Territory of Missouri, which lots have been inhabited, cultivated, or possessed, prior to the twentieth day of December, one thousand eight hundred and three, shall be and the same are hereby confirmed to the inhabitants of the respective towns or villages aforesaid, according to their several right or rights in common thereto: *Provided,* That nothing herein contained shall be construed to affect the rights of any persons claiming the same lands, or any part thereof, whose claims have been confirmed by the board of commissioners for adjusting and settling claims to land in the said territory. And it shall be the duty of the principal deputy surveyor for the said territory, as soon as may be, to survey, or cause to be surveyed and marked,

(where the same has not already been done, according to law,) the out-boundary lines of the said several towns or villages, so as to include the out-lots, common field lots, and commons, thereto respectively belonging. And he shall make out plats of the surveys, which he shall transmit to the surveyor-general, who shall forward copies of said plats to the Commissioner of the General Land Office, and to the recorder of land titles; the expense of surveying the said out-boundary lines shall be paid by the United States out of any moneys appropriated for surveying the public lands : *Provided*, That the whole expense shall not exceed three dollars for every mile that shall be actually surveyed and marked.

"SEC. 2. *And be it further enacted*, That all town or village lots, out-lots, or common field lots, included in such surveys, which are not rightfully owned or claimed by any private individuals, or held as commons belonging to such towns or villages, or that the President of the United States may not think proper to reserve for military purposes, shall be, and the same are hereby reserved for the support of schools in the respective towns or villages aforesaid : *Provided*, That the whole quantity of land contained in the lots reserved for the support of schools in any one town or village, shall not exceed one-twentieth part of the whole lands included in the general survey of such town or village."

There are numerous acts of Congress, confirming titles reported upon favorably by this commission, to be found in the years subsequent to its appointment, as well as many statutes displaying the utmost liberality in extending the time within which parties might apply to this commission, or to an officer who as recorder succeeded to it, so that the patience and generosity with which Congress endeavored to have these claims originating in those early days established, where there was any basis of right whatever, is conspicuous. Congress also dealt with the State of Missouri, in regard to contributions for the erection of public buildings and for the promotion of education, in the same liberal manner as it did in regard to other regions which were admitted as new States,

that had previously been governed for a while as Territories under its enactments.

By the act of March 3, 1811, Congress extended the system of the surveys of the public lands over this region, and in the tenth section, providing for sales of such public lands as should have been surveyed, declared that "All such lands shall, with the exception of the section 'number sixteen,' which shall be reserved in each township for the support of schools within the same, with the exception also of a tract reserved for the support of a seminary of learning, as provided for by the seventh section of this act, and with the exception also of the salt springs and lead mines, and lands contiguous thereto, which by the direction of the President of the United States may be reserved for the future disposal of the said States, shall be offered for sale to the highest bidder;" etc.    2 Stat. 665, c. 46, § 10.

When the time came for the admission of Missouri into the Union, among the propositions which Congress submitted to the people of the Territory upon which it might be admitted as a State, the first was "that section numbered sixteen in every township, and when such section has been sold, or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to the State for the use of the inhabitants of such township, for the use of schools."    Act of March 6, 1820, c. 22, § 6, subdivision 1.    3 Stat. 547.

The acceptance by the State of this proposition, as one of the conditions under which it entered the Union, forms the basis of the title claimed by the plaintiff in this suit.    By the general system of surveys of public lands which had been established prior to the act of 1811, all the public lands of the United States, and all those within the general boundary, as fast as they were surveyed at all, were divided first into townships of six miles square, each of which was then subdivided into sections of 640 acres.    These townships and sections were controlled by meridians of latitude and longitude, and not by natural objects; and although the lines, if actually protracted upon the ground, might extend over places of considerable population, and include lands owned by private citizens, yet

as it was necessary to the completion of the general system of Congressional surveys, they were made to cover the whole country and to include the entire territory. As regards the sixteenth section, of course when these surveys were protracted, either by a simple calculation or by actual survey over lands which were claimed or owned by private persons, or which had been reserved for public purposes, they had no effect to defeat or establish such titles, but all that came within the lines of such sixteenth section, which was not otherwise appropriated, became the property of the State for school purposes.

The conflict in this case grows out of the assertion by the plaintiff that the land in controversy passed to the State by virtue of the act of 1820, as part of a sixteenth section, while the defendants claim that the title and right to it passed out of the government of the United States by the act of 1812, eight years prior to admission of the State into the Union, and the act granting each sixteenth section to the State. It is not denied that the lines of the sixteenth section of township forty-five north, range seven east of the principal meridian, include the land in dispute, nor, if there was no reason to the contrary, that it passed to the State of Missouri under the provisions of the act admitting it into the Union. Neither is there any dispute that the plaintiff in error in this case, who was also plaintiff below, is invested as commissioner for the purposes of this suit with the right of the State of Missouri to the possession.

The defendants say, on the other hand, that they and their predecessors from whom they derive title became the owners of this land by operation of the act of 1812, and that the United States, having by that act parted with its title, had nothing to give to the State of Missouri by the act of 1820, and did not intend to give to that State that which had been granted and confirmed already to private parties.

These two propositions present sharply the issue to be tried in the present case.

*Mr. Elmer B. Adams* and *Mr. John W. Dryden* (with whom was *Mr. M. L. Gray* on the brief) for plaintiff in error.

I. The reservation, created by the second section of the act of June 13th, 1812, for the schools of the village of St. Louis, presents no obstacle to plaintiff's recovery under the grant to the State of Missouri of March 6th, 1820, for the schools of the township. (1) Because such reservation did not take away from the United States, by act of its Congress, *the power* of disposition of the lands so reserved. c. 99, §§ 1, 2, act of June 13, 1812, 2 Stat. 749, 750; c. 184, § 2, act of May 26, 1824, 4 Stat. 65, 66; c. 22, § 6, act of March 6, 1820, 3 Stat. 547; *Slidell* v. *Grandjean,* 111 U. S. 412, 439; *Ham* v. *Missouri,* 18 How. 126; *Kissell* v. *St. Louis Public Schools,* 18 How. 19, 25; *Frisbie* v. *Whitney,* 9 Wall. 187; *The Yosemite Valley Case,* 15 Wall. 77; *Hammond* v. *St. Louis Public Schools,* 8 Missouri, 65; *Cabanné* v. *Walker,* 31 Missouri, 275; *State* v. *Ham,* 19 Missouri, 592; c. 12, act of January 27, 1831, 4 Stat. 435. (2) Because the land in controversy is not included within the out-boundary line required to be surveyed by the 1st section of the act of 1812 (and afterwards actually surveyed), and is therefore not within the area of the supposed reservation, and is not covered or affected by it; the grant being made subject to a contingency which never happened, became absolute. Act of June 13, 1812, §§ 1, 2, 2 Stat. 749; *Kissell* v. *St. Louis Public Schools,* 18 How. 19; *Cousin* v. *Blanc,* 19 How. 202; *West* v. *Cochran,* 17 How. 403; *Stanford* v. *Taylor,* 18 How. 409; *Slidell* v. *Grandjean,* 111 U. S. 412; *Glasgow* v. *Hortiz,* 1 Black, 595; *Eberle* v. *St. Louis Public Schools,* 11 Missouri, 247, 264; *Boyce* v. *Papin,* 11 Missouri, 16; *Trotter* v. *Public Schools,* 9 Missouri, 69; *Kissell* v. *St. Louis Public Schools,* 16 Missouri, 553; *Papin* v. *Ryan,* 32 Missouri, 21; *Bryan* v. *Forsyth,* 19 How. 334; *Dredge* v. *Forsyth,* 2 Black, 563; *Water & Mining Co.* v. *Bugbey,* 96 U. S. 165. (3) No intent or purpose can be imputed to Congress not to include within the grant of 1820, to the State of Missouri, the particular sixteenth section sued for in this action, on the ground that it fell within the exterior limits of the Grand Prairie Common Field; so supposed to have been reserved for the schools of the village: because (*a*) presumptions should be indulged in favor of the grant rather than

against it; (*b*) the grant to the State was for a valuable consideration; (*c*) the grant to the State is not inconsistent with the reservation for the schools of the village; (*d*) the prior reservation of every 16th section for the schools of the township made by the 10th section of the act of March 3, 1811, together with concurrent legislation, manifest a clear intent to appropriate by the act of 1820 this 16th section to the use of the township schools, and necessarily to exclude it from the operative effect of the reservation for the schools of the village made by the act of 1812; (*e*) Congress did not intend in any event to subject the grant to the State, to any greater contingency than the reservation as actually made — and as actually made, it did not affect this 16th section; (*f*) the same considerations which go to show an intent to exclude this 16th section from the operation of the grant to the State, because of the reservation of 1812, more strongly tend to show an intent to exclude this 16th section from the operation of the act of 1812, by reason of the prior reservation of 1811. Act of March 6, 1820, § 6, 3 Stat. 547; *Payne* v. *St. Louis County*, 8 Missouri, 476; act of March 3, 1811, § 10, 2 Stat. 665; ordinance of May 20, 1785, 1 Land Laws (1838), 11; ordinance of July 23, 1787, 1 Land Laws (1838), 24; ordinance of June 20, 1788, 1 Land Laws (1838), 29; act of March 26, 1804, 2 Stat. 279; act of March 3, 1803, 2 Stat. 234; act of April 21, 1806, § 11, 2 Stat. 394; act of March 3, 1819, 3 Stat. 521; act of May 6, 1822, 3 Stat. 680; act of April 30, 1802, § 7, 2 Stat. 175; act of April 19, 1816, § 6, 3 Stat. 290; act of April 18, 1818, § 6, 3 Stat. 430; acts of June 23, 1836, 5 Stat. 58 and 59; *Cooper* v. *Roberts*, 18 How. 173; *Beecher* v. *Wetherby*, 95 U. S. 517; *Wilcox* v. *McConnel*, 13 Pet. 498; *Leavenworth &c. Railroad* v. *United States*, 92 U. S. 733.

II. The facts disclosed by the record, that the entire Grand Prairie Common Field was, in Spanish times, prior to December 20, 1803, cultivated by undesignated and unknown inhabitants of the village of St. Louis, in lots adjoining each other, of various widths (ranging from 1 to 3 arpents), and running east and west with coterminous limits, entirely across the field, are not sufficient in law to establish, in favor of

the defendants and against the plaintiff in this case, a confirmation of the entire field, by the 1st section of the act of June 13, 1812, to such inhabitants, whoever they might be, either *en masse* or according to their several cultivations; and are not sufficient to establish (as against the plaintiff claiming title under the subsequent grant of March 6, 1820) that all such field had been "disposed of," within the meaning of the act of 1820, and thus to defeat plaintiff's recovery. (*a*). Because an analysis of the act of June 13, 1812, and the supplementary act of May 26, 1824, disclose that the confirmations were intended to be to the several claimants as they existed in 1812, according to their several rights; and are entirely inconsistent with the idea of confirmations without existing and known claimants in 1812. 2 Stat. 749, 4 Stat. 65. (*b*) Because the antecedent Spanish laws, regulations, habits and customs, in the light of which Congress was acting, rendering forfeitures of rights and abandonment of claims possible, show that the act of June 13, 1812, was not intended to work confirmations *to cultivators*, without regard to the time of their cultivation or without regard to whether they had claims to their lots at the date of the passage of the act. 1 Partidas, Law 50, p. 365 ; 2 White's Recopilacion, p. 229, §§ 1 and 2 ; p. 233, §§ 14 and 16 ; p. 235, art. 4 ; *Les Bois* v. *Bramell,* 4 How. 460 ; *Ott* v. *Soulard,* 9 Missouri, 581, 605 ; *Landers* v. *Perkins,* 12 Missouri, 238, 256 ; *Lajoye* v. *Primm,* 3 Missouri, 529 ; *Gurno* v. *Janis,* 6 Missouri, 330 ; *Page* v. *Scheibel,* 11 Missouri, 167 ; *Tayon* v. *Hardman,* 23 Missouri, 539 ; *Fine* v. *Public Schools,* 23 Missouri, 570 ; 30 Missouri, 166 ; 39 Missouri, 59 ; *Strother* v. *Lucas,* 12 Pet. 410 ; *United States* v. *Arredondo,* 6 Pet. 691, 747. (*c*) The authorities assert the necessity of an existing claim and claimant in 1812 ; that it *is the claim* and not the cultivation that is confirmed ; that proof of cultivation is not enough. *Page* v. *Scheibel,* 11 Missouri, 183 ; *Vasques* v. *Ewing,* 42 Missouri, 256 ; *St. Louis* v. *Tooney,* 21 Missouri, 255 ; *Byron* v. *Sarpy,* 18 Missouri, 455 ; *Janis* v. *Gurno,* 4 Missouri, 458 ; *Soulard* v. *Clark,* 19 Missouri, 570 ; *Lajoye* v. *Primm,* 3 Missouri, 534 ; *Hammond* v. *Coleman,* Sup. Ct. of Missouri, unreported ; *Glasgow* v. *Baker,* 14 Missouri, App. 201,

207. (*d*) The fact of general cultivation at some indefinite time, during the Spanish dominion, by unknown persons, does not involve any presumption (even if a claim co-existed with the cultivation) that it continued from such indefinite and unfixed period of time down to the passage of the act of 1812. Proof of cultivation is made sufficient evidence of *right or title* in the claimant, *if a claimant exists*, but it does not involve the existence of the claim or claimant in 1812 or at any other time, and the authorities have gone only to this extent. *Guitard* v. *Stoddard*, 16 How. 494, 510; *Vasseur* v. *Benton*, 1 Missouri, 296; *Lajoye* v. *Primm*, 3 Missouri, 535; *Montgomery* v. *Landusky*, 9 Missouri, 714; *Soulard* v. *Clark*, 19 Missouri, 570; *Carondelet* v. *St. Louis*, 25 Missouri, 460; *Hammond* v. *Coleman*, Supreme Court of Missouri, unreported; *Glasgow* v. *Baker*, 14 Missouri, App. 207.

III. The fact of such general cultivation, by unknown persons, at unfixed and indefinite times, during the Spanish dominion, as hereinbefore stated, is not sufficient to constitute an outstanding title and thus to defeat plaintiff's recovery. Act of March 6, 1820, *supra; Ham* v. *Missouri*, 18 How. 126. (*a*) Because such title to avail an intruder must be a present subsisting and operative title and one upon which the owner could maintain ejectment and *its existence must be established beyond controversy. Greenleaf* v. *Birth*, 6 Pet. 302; *Jackson* v. *Hudson*, 3 Johns. 375, 386; *S. C.* 3 Am. Dec. 500; *Foster* v. *Joice*, 3 Wash. C. C. 498, 501; *Bennett* v. *Horr*, 47 Michigan, 221; *McDonald* v. *Schneider*, 27 Missouri, 405. *Marsh* v. *Brooks*, 8 How. 223, can be distinguished from this case. Such title in such supposed unknown persons at the remote period of 1803, or even 1812, not having been asserted, and the supposed unknown owners being still unknown and unidentified in 1882, when the trial of this cause took place, must be presumed to have become extinguished.

The consequences of the doctrine contended for by defendants, that such proof of general cultivation alone establish an outstanding title sufficient to defeat plaintiff, condemn the doctrine.

Counsel discussed other points in their brief and in the argu-

ment, but in view of the opinion of the court it is not necessary to present them.

*Mr. C. Gibson, Mr. Robert E. Collins,* and *Mr. Thomas T. Gantt* for defendants in error.

*Mr. John Flournoy* also filed a brief for same

MR. JUSTICE MILLER, after stating the case. delivered the opinion of the court.

It will be seen at once that there is really no contest about the claim of the plaintiff, unless the defendants have established some break in the continuity of the title which the United States may have received from France by the treaty of 1803, or unless the exceptions in that treaty of private property take the land in controversy out of that class where the right of ownership was vested in the United States by the treaty. We must turn then to the defence in this case to ascertain whether the decision of the Supreme Court of Missouri is sound which held that defence to be a good one.

There is no question here as to the jurisdiction of this court, although the case comes from the Supreme Court of a State, for every matter in dispute arises either under the treaty of 1803, the acts of Congress in regard to these lands, or the authority of some officer of the government of the United States exercised over them.

The act of June 13, 1812, was passed, as we have stated, for the purpose of prescribing more liberal principles by which the claims of private persons to portions of what otherwise would have been public land should be ascertained and established, and its provisions must be construed in that spirit. The inhabitants of French villages had a system of dividing and distributing the ownership of lands in and about them not common to people of English origin. Collecting themselves together for residence in that part of the settlement which may be called the village proper, they selected small parcels of land for cultivation, which were generally long strips with

narrow fronts. These measured by the French arpent were usually two or three arpents wide by forty in length, running backward in the shape of a parallelogram. The dividing lines between these adjoining tracts, which were held by different owners, were sometimes well marked, but in other cases not so distinctly indicated. The ground in which these small pieces of land were thus held by their various individual owners was known as the "town or village lots, out-lots, common field lots and commons," belonging to the particular village. A large number of the villages in the northern part of Louisiana, which afterwards came to be called the Territory of Missouri, had these outlying appendages to the village proper, which were always treated as a part of it. The act of 1812 very carefully gives the names of the villages so situated, reciting the names of "Portage des Sioux, St. Charles, St. Louis, St. Ferdinand, Villago' a Robert, Carondelet, St. Genevieve, New Madrid, New Bourbon, Little Prairie, and Arkansas, in the Territory of Missouri," as those to which the act applied. It also declares that "the rights, titles and claims" intended to be covered by that statute are those to the "town or village lots, out-lots, common field lots, and commons in, adjoining, and belonging to the several towns or villages" thus designated.

It will thus be seen with what care the statute enumerated the villages to which it was intended to apply and the kind of claims to tracts of land therein proposed to be covered by it.

The act then proceeds to confine its operation to those lots which "have been inhabited, cultivated, or possessed prior to the twentieth day of December, 1803," that being the date on which, as already stated, the government and possession of the territory in which these settlements are located were actually transferred from France to the United States. It may also be noted that the language of the statute does not refer to lots then inhabited, cultivated, or possessed, that is, on December 20, 1803, but to such as had been so inhabited, cultivated, or possessed prior to that date. There is nothing in the act which implies that the title conferred by it was

dependent on actual possession at the very date when the above transfer was made, but, on the contrary, if there had been habitancy, cultivation or possession prior to that time, the act operated upon the property.

It will also be observed that these qualifications of what is, to be confirmed require no description of the person of the owner, nor any evidence that any particular individual shall be proved to have inhabited, cultivated, or possessed any lot prior to December 20, 1803, nor any derivation of title from such a party, but simply that the land shall have been inhabited, cultivated, or possessed prior thereto. The act then proceeds to declare that "the same," evidently referring back to the "rights, titles, and claims," mentioned at the beginning of the section, to such lots as these, which "have been inhabited, cultivated, or possessed, prior to the 20th day of December, 1803, shall be, and the same are, hereby confirmed to the inhabitants of the respective towns or villages aforesaid, according to their several right or rights in common thereto."

The same section also made it the duty of the principal deputy surveyor to run and mark "the out-boundary lines of the said several towns or villages so as to include the out-lots, common field lots and commons thereto respectively belonging."

Testimony was offered in the trial court, which is found in the transcript of the record in this case, tending to show that the land now in controversy had been confirmed to four different individuals, Laroche, Bouis, Baccanne and Bizet, respectively, by the Board of Commissioners established by the act of 1812, and that surveys of those confirmations, which, for reasons not necessary to explain, had been delayed a great many years, had finally been made by one Cozens. The court was asked to hold that those surveys constituted "*prima facie* evidence of the correct location of such confirmations." The lower court declined to do this, but the Supreme Court of the State in reversing its judgment declared that they were such *prima facie* evidence.

Although the duty of making a survey of the village of St. Louis, which should include all these outlying commons, out-

lots and common field lots, was neglected by the officers of the government charged with its performance by the first section of the act of 1812, which we have been considering, such surveys have been made, and plats are presented in this record showing the locality of the village of St. Louis in 1803, together with the extent and location of each of the above classes of commons and out-lots. Among these is a large piece of land, designated as the " Grand Prairie Common Field of Saint Louis," within which all the land in dispute is embraced. There is also evidence enough' to show that all the land within this tract had been occupied and cultivated, within the meaning of the act of 1812, prior to December 20, 1803, and this fact is conceded in the argument of counsel for plaintiff in error, even if it were not clearly established. It may be taken as an unquestioned fact, as it is in the argument and in the Supreme Court of Missouri, that all the lands in the Grand Prairie Common Field had been occupied, cultivated and possessed by the inhabitants of the village of St. Louis prior to December 20, 1803.

Under these circumstances the trial court was asked to declare the law to be as follows:

"If the court, sitting as a jury, believes from the evidence that all of the land, from the lot of Motard on the south, to the St. Charles road on the north, was inhabited, cultivated, or possessed as common field lots of the Grand Prairie Common Fields of St. Louis, by several different inhabitants of the town of St. Louis, prior to the 20th day of December, 1803, each of said inhabitants cultivating or possessing one or more such lots for himself, that such lots were in regular succession adjoining each other on the sides, and all having uniform and straight front, east and west lines, then the plaintiff cannot recover, if the court, sitting as a jury, further believes from the evidence that the land sued for lies within, or constitutes a part of, the land cultivated or possessed as aforesaid."

This it declined to do, but the Supreme Court of the State held that this prayer of the defendants in error stated the law correctly and reversed the judgment of the court below and directed a final judgment to be entered for them. This was

done on the ground that the fact that all of the lands in the Grand Prairie Common Field of St. Louis had been inhabited, cultivated and possessed prior to the treaty of 1803, showed that there could be no other title than that derived from the persons so inhabiting, cultivating or possessing the land, and that the true construction of the act of 1812 is that it was a present grant, at the moment of its passage, of all the title of the United States to such land as had been so inhabited, cultivated, or possessed prior to 1803. It was held that the title thus passed out of the United States, and enured to the benefit of those who might thereafter by contests among themselves prove their right to profit by such cultivation or possession; that however it might be among them and parties claiming under them, the United States had no further interest in the land, for it had parted with its entire title to all the lots described in the act; so when it was asserted that in 1820, eight years thereafter, the act granting the sixteenth section for school purposes conveyed such land, the claim could not be admitted, because there was then no title remaining in the United States which it could grant to the State of Missouri.

That the act of 1812 was a grant *in præsenti,* and operated to convey or confirm such titles and claims as came within its description, has been repeatedly decided in the Supreme Court of the State of Missouri and by this court. The case of *Glasgow* v. *Hortiz,* 1 Black, 595, contains a very full examination of this point and of the previous decisions of the court upon the same subject, and, citing the case of *Guitard* v. *Stoddard,* 16 How. 494, adopts the following language of the court:

" ' That the act of 1812 is a present operative grant of all the interest of the United States in the property described in the act; and that the right of the grantee was not dependent on the *factum* of a survey under the Spanish government.' That the act ' makes no requisition for a concession, survey, or permission to settle, cultivate, or possess, or for any location by a public authority, as the basis of the right, title, or claim upon which its confirmatory provisions operate.' No board was appointed to receive evidence, or authenticate titles, or

adjust contradictory pretensions. All these questions were left to be decided by the judicial tribunals." p. 601.

The court also said:

" The claims of these old villages to their common field lots, and the peculiar customs regarding them, were well known. Congress, therefore, did not require that any documentary evidence should be filed, nor a report of commissioners thereon. A survey was considered unnecessary, because the several boundaries of each claimant of a lot, and the extent of his possession, were already marked by boundaries, well known among themselves. They required no record in the land office to give validity to the title. The act is certainly not drawn with much regard to technical accuracy. It is without that certainty, as to parties and description of the property granted, which is required in formal conveyances. But a title by statute cannot be thus criticised. It sufficiently describes the lands intended to be granted, and the class of persons to whom it is granted. Besides, it is not a donation, or mere gift, requiring a survey to sever it from other lands of the donor; but, rather, a deed of confirmation to those who are admitted to have just claims. It passes a present title, *proprio vigore,* of the property described to the persons designated; a patent to another afterwards, for any of these lands, would be void, because the government had already released all title and claim thereto. If Congress could not grant them to another, much less could the arbitrary edict, or imperfect performance of a neglected duty by a ministerial officer, operate to divest a clear title by statute." pp. 600, 601.

The land in question had been in the possession of the original defendant, Peter Lindell, for the time which would be required to bar this action by the statute of limitations before it was brought, and, extending as it does over a period of thirty or forty years, it is only prevented from thus operating by the principle which does not permit time to run against the government. But it cannot lose its force or value in the consideration of the question, whether the act of 1820 is to be construed as granting lands to the State of Missouri for the use of public schools which had already passed to others under

the act of 1812 by virtue of prior occupation, cultivation, or possession. When the defendants have proved that the land in controversy either belonged to the "Grand Prairie Common Field of Saint Louis," or that the lots in dispute had been inhabited, cultivated, or possessed prior to 1803, it would be a very harsh rule to require one who claims to have purchased the title arising from such occupation, cultivation, or possession, to prove with certainty and precision the time when, and the person who, cultivated or occupied that precise property eighty or ninety years ago. Those who could testify from actual knowledge are perhaps all dead; the population of that time has passed away, and the memories of any who may be living would be very imperfect. Neither the spirit of the statute, nor justice can require anything more than satisfactory proof that according to the terms of the statute such lots, and all the land within the Grand Prairie Common Field, had been inhabited, cultivated, or possessed prior to the year 1803.

Such was the decision of the Supreme Court of the State of Missouri in this case, reported in 50 Missouri, 60, again in 72 Missouri, 441, and finally in 85 Missouri, 559, which is now under review. Such is also the spirit of all the decisions which this court has made upon the subject, the substance of which is found in *Glasgow* v. *Hortiz, supra,* which had relation to one of the same class of lots in dispute here.

If we had any doubt as to the views above expressed, the reasons for which seem to be very plain, the three decisions above referred to of the Supreme Court of Missouri would be entitled to very great consideration. They were made at times so far apart that upon each occasion when a decision was rendered the court probably consisted of an entirely different body of judges; and they were arrived at by a court especially familiar with this class of questions, lying, as they do, at the foundation of much of the most valuable property in that State.

Other questions have been argued by counsel in this case, and we have been urged in the brief to decide them; but as this proposition is a broad one, which covers the whole case, and is sufficient to dispose of it, we pursue our uniform course

of declining to consider other matters not necessary to a determination of the issue. If the plaintiff in this action had no title under the act of 1820, because the United States had none to give, he had no right of action, and the case was properly decided against him.

The judgment of the Supreme Court of Missouri is therefore

*Affirmed.*