## LAKE SUPERIOR SHIP CANAL, RAILWAY & IRON CO. *v.* CUNNINGHAM.

(*Circuit Court, W. D. Michigan, N. D.*   February, 1890.)

1. PUBLIC LANDS—GRANTS IN AID OF RAILROADS—RELEASE AND SURRENDER—CONSTRUCTION OF ACTS.
Act Cong. June 3, 1856, granted to the state of Michigan a certain quantity of public lands to aid in the construction of certain railroads, among which were specified one from Marquette to the Wisconsin state line and another from Ontonagon to the state line.   It was provided that the lands thus granted for the benefit of each of said roads should be "exclusively applied in the construction of that road, * * * and shall be disposed of only as the work progresses; and the same shall be applied to no other purpose whatever."   By Act Mich. Feb. 14, 1857, this grant was accepted by the state, subject to all conditions therein contained, and the lands granted for the benefit of the roads from Marquette and Ontonagon to the Wisconsin line were conferred respectively on two distinct companies.   By successive consolidations of each of these companies with a third, and by sale under foreclosure of the latter, all the property, rights, and franchises of the Mar-

quette and Ontonagon Companies were vested in the Chicago & North-Western Company. This latter requested the Michigan board of control to confer on the Peninsula Company all the benefits of the grant vested in the Marquette Company. This was done by act of the legislature. The proposed route of the Peninsula Company necessitated a change and relocation of the line previously surveyed and approved for the Marquette Company. Congress authorized this change by joint resolution, July 5, 1862, which made a similar grant of lands along the new route, conditioned on a release of the lands previously selected and certified under the act of 1856 along the original route, with the governor's certificate of non-incumbrance. This condition was complied with, and the grant duly conferred on the Peninsula Company, the governor being authorized, by joint resolution of the legislature in February, 1867, to "execute the certificate of surrender and non-incumbrance of the lands on the original line of the Marquette Company." The commissioner of the general land-office, on July 13, 1868, requested the Chicago & North-Western Company to execute a similar release of the lands previously selected and certified for the line of the Ontonagon Company. This release was accordingly executed, and the governor attempted to surrender the lands in the same manner as had been done in the case of the Marquette Company. *Held*, that the joint resolution of 1862 gave the commissioner no authority to demand a release of the Ontonagon Company's lands, and the governor's attempted surrender of them was void and of no effect to divest the title of the state thereto as trustee for such company.

2. SAME—INTEREST OF BENEFICIARIES—LEGAL TITLE.
As Act Cong..June 3, 1856, prescribed the manner in which the granted lands should be disposed of by the state for the benefit of the designated railroads, and so vested the title in the state for the purposes of the act, Act Mich. Feb. 14, 1857, which conferred the benefit of that grant on the Ontonagon Company *inter alia*, did not convey the legal title to that company so that it should vest in the Chicago & North-Western Company by virtue of the consolidation mentioned, and then pass by its surrender.

3. SAME—JURISDICTION OF LAND DEPARTMENT—GRANTED LANDS—SUBSEQUENT SELECTION AND APPROVAL.
Act Cong. July 3, 1866, granted to the state of Michigan a certain quantity of "the lands of the United States," to be selected by an agent of the state for the benefit of a ship canal. The president of the canal company was appointed such agent, and among other lands he selected 15,000 acres within the limits of the grant of 1856 to the Ontonagon Company. The land department approved the land so selected to the state for the benefit of the canal. *Held* that, though this certificate of approval has the force of a patent, it is absolutely void as to the Ontonagon lands, for by the prior grant and appropriation they were withdrawn from the jurisdiction of the land department, and had never been released, or declared forfeited to the United States.

4. SAME—TITLE TO SUPPORT EJECTMENT—DEFENSE BY TRESPASSER.
Such certificate being absolutely void, defendant in ejectment can attack the title of the canal company claiming under it, without in any way connecting himself with the title to the land, or showing that he is other than a mere trespasser.

5. SAME—ESTOPPEL OF STATE BY ACT OF AGENT—NOTICE TO BENEFICIARY.
The state is not estopped to claim title to these Ontonagon lands by the act of its agent in selecting them for the canal company, for such agent was also an officer of the company, and the company, through him, is chargeable with notice of all the above-mentioned public acts in relation to such land, and hence of the fact that it was not subject to appropriation under the grant to the canal company.

6. ESTOPPEL IN PAIS—UNAUTHORIZED ACTS—DIVERSION OF RAILROAD LAND GRANTS.
As Act Cong. June 3, 1856, vested such lands in the state for the purpose of an express trust, which the state accepted subject to all the limitations contained in the grant, the state had no power to divert such lands to any other purpose, and hence it cannot be estopped to claim title thereto by any act of its agent attempting to appropriate them to any other use than that of the *cestui que trust* named in the grant.

SEVERENS, J., dissenting.

## On Motion for New Trial.

This was an action of ejectment, in which the trial court directed a verdict for plaintiff. For opinion on second trial of the case, see *ante*, 587.

*Alfred Russel* and *Ball & Hanscom*, for plaintiff.

*Don M. Dickenson* and *Marston, Cowles & Jerome*, for defendant.

JACKSON, J.  From a careful examination of the record in this case, in the light of the able briefs submitted by counsel on both sides, the circuit judge has reached the following conclusions, viz.:

The act of congress approved June 3, 1856, by its express terms, contemplated and provided for the construction of several distinct and independent lines of railway.  The grant was made to the state of Michigan, "to aid in the construction of railroads."  The lines of said railroads were designated, and among them was that from Ontonagon to the Wisconsin state line.  The grant embraced "every alternate section of land designated by odd numbers for six sections in width on each side of each of said roads."  It was further provided "that the lands so to be located shall in no case be further than fifteen miles from the lines of said roads, and selected for and on account of each of said roads," and the lands thus granted for the benefit of each of said roads were to "be exclusively applied in the construction of that road for and on account of which such lands are hereby granted, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever."  It is further provided by the third section of the act that the lands thus granted to said state should be subject to the disposal of the legislature thereof, for the purpose aforesaid, and no other.  The manner of such disposition for each of said roads is prescribed by the fourth section of the act, and "if any of said roads is not completed within 10 years no further sales shall be made, and the lands unsold shall revert to the United States."  The legislature of Michigan, in accepting said grant, by the act approved February 14, 1857, clearly recognized the purpose and intent of congress to aid in the construction of separate and distinct lines of railroad.  The benefits of the grant intended to aid in the construction of the railroad from Ontonagon to the Wisconsin state line were vested in or conferred upon the "Ontonagon & State Line Railroad Co.," organized under laws of the state, in 1856.  In like manner the lands to be located along the other lines of road designated in the granting act were conferred upon other companies having a separate corporate existence from that of the "Ontonagon & State Line Railroad Co.," and by the third section of the act "the lands, franchises, rights," etc., thus conferred upon and vested in said railroad companies, or either of them, were to be exclusively applied in the construction of their respective lines of railroad as designated, and were not to be applied to any other purpose whatsoever.  Both by the granting act and the act of acceptance, each of said railroads were to be public highways.  For each of said lines separate surveys and locations were made, separate maps therefor were filed in the interior department, separate selections of lands within the limits of the grant were made for each of the lines, separate approvals of such selections were made by the secretary of the interior, for each of said railroads, and were separately certified by the department to the state for the benefit of each, respectively.  The trusts thus created by the United States as grantor, and accepted by the state as trustee, for specific and defined purposes, and for designated objects, were subject to the single condition subsequent, that if any or either of

said roads was not completed within 10 years from June 3, 1856, the lands granted and appropriated to such line, and remaining unsold, should revert to the United States. Until the expiration of said period of 10 years and the non-completion of the Ontonagon & State Line road, no action of either state or United States officials, or of both combined, could change, modify, or alter the trust created and accepted for the construction of that particular line; nor could the lands assigned to that line, and certified to the state for its construction, be lawfully appropriated by such officials to the construction or benefit of any other line whatsoever. The trust declared and accepted required that they should be exclusively applied in the building and completion of that road, and no other. To effect any other application or disposition of these lands would require the consent of the United States, expressed through congress, and of the state, expressed through its legislature, and of the railroad company on which said lands had been conferred, or its successors or assigns in right. It is equally well settled that the United States alone could take advantage of the non-performance of said condition subsequent, and that so long as they failed or neglected to assert their right of forfeiture, even after condition broken, the trust created for the construction of the Ontonagon & Wisconsin State Line road would stand unimpaired, and the title to the lands granted and certified to the state for the benefit of that line would remain out of the United States, and from no part of the public domain. It is also settled that, the grant being a public one, the reserved right of the United States to reclaim these lands, or to declare them forfeited for breach of the condition subsequent, would have to be asserted either by judicial proceedings, authorized by law, or by some legislative assertion of ownership of the property for condition broken, such as an act of congress, directing the possession and appropriation of the land, or that it be offered for sale and settlement. *Schulenberg* v. *Harriman*, 21 Wall. 44. In order that an act of congress should work a reversion to the United States for condition broken of lands granted by them to a state to aid in internal improvements, the legislation must directly, positively, and with freedom from all doubt and ambiguity, manifest the intention of congress to reassert title and resume possession. *Railway Co.* v. *McGee*, 115 U. S. 469, 6 Sup. Ct. Rep. 123. The United States, prior to March 2, 1889, never by judicial proceedings authorized by law, nor by legislative action, asserted ownership of the lands in question, or exercised its reserved right of forfeiture for condition broken in failing to complete the road. By the act of March 2, 1889, congress declared certain lands granted to the state of Michigan, for railroad purposes, by the act of 1856, forfeited. This act confirmed certain rights, titles, and entries, but need not be specially noticed, as it is a matter of construction and grave debate whether its confirmatory provisions are most in favor of plaintiff or defendant. Both sides claim the benefit of its provisions. The act was not, however, passed upon by the trial judge, who directed a verdict for the plaintiff upon other grounds. .

It is claimed for plaintiff that by the joint resolution of congress,

adopted July 5, 1862, the several trusts, as above indicated, were changed, with the acquiescence of the state and the companies interested, and that under the operation of that resolution the several railroads contemplated and provided for by the act of June 3, 1856, were abandoned, and one consolidated system was established upon a new line from Marquette to a point on the Wisconsin state line, near the mouth of the Menomonee river.    The joint resolution of congress does not, upon its face, admit of this construction, nor do the facts and circumstances which led to its adoption warrant the court in giving it any such strained interpretation.    The language of the resolution relates to, and only mentions, the line of railroad from Marquette to the Wisconsin state line, whose relocation alone was sought and applied for.    The Peninsula Railroad Company, which sought the relocation of the line from Marquette to the Wisconsin state line, so as to carry the road to a point near the mouth of the Menomonee river, had no interest in or connection with the line of road from Ontonagon to the Wisconsin state line, nor in the lands selected and certified to the state for the benefit of that line, when said joint resolution of congress was applied for and procured.    Said Peninsula Railroad Company had only succeeded to the rights, privileges, and franchises of the Marquette & State Line Railroad Company.    A brief reference to the facts will make this clear.

The Marquette & State Line Railroad Company first consolidated with the Chicago, St. Paul & Fond du Lac Railroad Company.    This consolidated company subsequently, on March 27, 1857, consolidated with the Ontonagon & State Line Railroad, under the name of the Chicago, St. Paul & Fond du Lac Railroad Company, and, so far as such rights could be transferred or assigned, succeeded to all property, franchises, rights, and privileges which the Ontonagon & State Line Railroad Company had acquired, or could acquire, under all or any acts of congress. The Chicago, St. Paul & Fond du Lac Company was sold under mortgage, in 1859, and its property, rights, franchises, etc., were purchased by the Chicago & North-Western Railway Company.    Having, by this purchase, succeeded to all the rights and interests of both the Marquette & State Line Railroad and of the Ontonagon & State Line Railroad, in and to the granted trust lands, (assuming that they were the subject of transfer and assignment by said two companies,) the Chicago & North-Western Railway Company, in February, 1862, requested the Michigan board of control of railroad grants to confer upon the Peninsula Railroad Company all the benefits of the grant of 1856, which had been vested in the Marquette & State Line Railroad.    Said board of control, in compliance with said request, and upon the application of said Peninsula Railroad Company, under the authority of an act of the Michigan legislature approved March 4, 1861, ordered that all the lands, franchises, rights, powers, and privileges, which were or might be granted in pursuance of said act of congress approved June 3, 1856, to aid in the construction of a railroad from Marquette to the Wisconsin state line, "be, and the same are hereby, conferred upon the said Peninsula Railroad Company, under the regulations and restrictions of an act approved Feb-

ruary 14, 1857." The Peninsula Railroad Company was organized for the purpose of constructing a railroad from Marquette to the Wisconsin state line, at or near the mouth of the Menomonee river, which route necessitated a change in and relocation of the line of the Marquette & State Line Railroad, as surveyed and located under the granting and accepting acts of 1856 and 1857. This change and relocation of said line was recommended to congress by said board of control of railroad grants at the time of conferring upon said Peninsula Railroad Company the benefits of the grant previously vested in the Marquette & State Line Railroad Company. This proposed change and relocation of the Peninsula Railroad Company's line, after lands had been selected and certified in December, 1861, for the original line of the Marquette & State Line Railroad, required the assent of both congress and the state, because it involved a clear departure from the exclusive trust granted by the United States and accepted by the state under the acts of 1856 and 1857; hence the application to congress for the joint resolution of July 5, 1862, which related alone to the proposed change of the original line from Marquette to the Wisconsin state line, so as to permit a relocation thereof on the line of the Peninsula Railroad Company's charter route. The joint resolution of congress authorized this relocation of said line, and as an incident thereto operated as a new grant of lands to the state for the benefit of such new line, upon releasing the lands previously selected and certified for the original line of road, with a certificate from the governor of Michigan that all claim thereto by the state and said Peninsula Railroad Company was surrendered, and that the same had never been pledged, sold, or in any wise incumbered. There had been selected for this original line from Marquette to the Wisconsin state line, and duly certified to the state by the interior department, in December, 1861, about 161,104 acres. This land the Peninsula Railroad Company, in May, 1863, released and surrendered to the United States under and in pursuance of said joint resolution of congress of July 5, 1862, and in consideration of the relocation of said land grants so as to conform to its new line. The state, by an act supplemental to the act of February 14, 1857, acceded to said joint resolution of congress, and confirmed unto said Peninsula Railroad Company the new grant of lands thereby provided for. Thus by the concurrent action of congress, of the state, and of the Peninsula Railroad Company, as the successor of the Marquette & State Line Railroad, the trust created by the act of 1856, in respect to the line of railroad from Marquette to the Wisconsin state line, was changed and made applicable to the relocated line of the Peninsula Railroad Company. This was the sole object of the resolution of 1862, and the sole change effected or alteration made in the trusts created and defined by the act of June 3, 1856. When said resolution was procured for and accepted by the Peninsula Railroad Company that company had no interest in and connection with the Ontonagon & State Line Railroad, for the benefit of which there had been previously selected and certified to the state of clear lands 142,430.23-100 acres. The joint resolution of congress did not expressly, or by any fair implication, call for or require

the surrender of those lands with which the Peninsula Railroad Company had no connection, and over which it could exercise no control. The joint resolution of congress is fully satisfied by confining its operation and effect to a change in the original grant and trust merely to the extent of allowing the old line from Marquette to the Wisconsin state line to be abandoned upon the surrender of the lands already certified to that line and permitting a relocation of the same on the route of the Peninsula Railroad Company's line to be run from Marquette to the Wisconsin state line at or near the mouth of the Menomonee river.    That this was the construction which the state of Michigan placed upon said resolution of 1862 is clearly shown by the joint resolution of the legislature of said state, passed in February, 1867, which is entitled "Joint resolution authorizing the governor to execute the certificate of non-incumbrance and surrender of the lands on the original line of the Marquette & Wisconsin State Line Railroad."    Said resolution of the state legislature, after reciting that by the act of congress approved June 3, 1856, there was made, among other grants to this state, a grant of lands to aid in the construction of a railroad from Marquette to the Wisconsin state line; that by joint resolution of congress a change in the route of said road was authorized and had been made; and that the company had executed a release of the lands on the original line,—provided "that the governor be, and he is hereby, authorized to execute and file the certificate of non-incumbrance and surrender to the United States of the land on the original line of said railroad, [from Marquette to the Wisconsin state line,] required by said joint resolution, [of 1862.]"

After the Peninsula Railroad Company consolidated with the Chicago & North-Western Railway Company, in 1864, under the name of the latter, said Chicago & North-Western Railway Company, under date of January 31, 1868, released to the state of Michigan the clear lands on the Marquette & Wisconsin State Line, and the governor of said state, on the 1st of May, 1868, under and in pursuance of the state resolution of 1867, and in compliance with the congressional resolution of 1862, released and surrendered the said lands to the United States.    This release by the governor was a full compliance with the requirements of both of said resolutions, and exhausted the governor's authority to deal with the subject of the granted lands.    The commissioner of the general land-office subsequently, on July 13, 1868, requested the Chicago & North-Western Railway Company to execute a similar release as to the 142,430 23-100 acres of clear lands previously selected and certified to the state in December, 1861, for and on account of the line from Ontonagon to the Wisconsin state line.    This request was unauthorized by any fair construction of the congressional resolution of 1862, and the governor of the state, in attempting to make the surrender of said lands in August, 1870, exceeded his authority, and his act was a nullity, and did not divest the state of its title thereto as trustee, nor in any way defeat or annul the trust created by the act of 1856 in respect to said lands, which were exclusively appropriated by congress to aid in the construction of the line of railroad from Ontonagon to the Michigan state line.

The commissioner of the land-office certainly had no authority, by virtue of his office or official duties, to deal with the subject of that trust created by congress.   He derived no authority from the resolution of 1862 to either disturb or terminate the trust created and declared for that line, or to recall the lands granted by the United States, and certified in 1861 to the state for its construction.   The congressional resolution of 1862 did not, in terms or by implication, confer upon the land department any jurisdiction whatever over the lands granted to the state to aid in the construction of this Ontonagon & Wisconsin State Line Railroad. Nor did the state resolution of 1867 confer upon the governor any authority, even by the most strained implication, to release and surrender the same.   The governor of the state had no more authority under said resolutions of congress and of the state, either or both, to surrender said 142,430 23-100 acres of land than he, as governor, would have had to convey them in defiance of the trust on which they were held by the state to a private individual without consideration.   The opinion of the attorney general, on which the governor acted, does not assert the existence of his authority to surrender these lands.   The attorney general was manifestly considering the lands relating to the old line from Marquette to the Wisconsin state line.   He expressly disclaims any knowledge of the correctness of description of said lands, and states that "if any of them should prove incorrect, I do not see how it could affect the state.   In such case your certificate would be a simple nullity, as being unauthorized by law,"—and at the close of his opinion he states that the release to be executed would "only release the interests of the state to such lands as are contemplated by the acts of congress approved June 3, 1856, July 5, 1862, and March 3, 1865."   It is perfectly clear that the attorney general did not intend to advise the governor that he had authority to release the lands on the Ontonagon & State Line road; nor did the release submitted for his consideration and opinion on its face purport to surrender the lands on that line of railroad.   It appears that, after the Peninsula Railroad Company consolidated with the Chicago & North-Western Railway Company, congress, by an act approved March 3, 1865, granted to the state of Michigan, for the purpose of aiding in the construction of a railroad from Marquette to the Wisconsin state line, at or near the mouth of the Menominee river, for the use and benefit of said Chicago & North-Western Railway Company, four additional alternate sections per mile to that already granted by said act of 1856, and the supplementary joint resolution of 1862.   But this in no way affected the grants made for other lines by the act of 1856.   Such grants and the trusts raised and declared to aid in the construction of the other railroads or lines designated in the granting act of congress and the accepting act of the state, remained wholly undisturbed and unaffected by either state or congressional action, when the governor of Michigan, without authority of law, executed the certificate and surrender of said 142,430 23-100 acres of land.   The land-office had no authority of law either to call for or to accept said release for and on behalf of the United States.   Congress, having made the grant and created the trust con-

nected therewith, could alone determine when the land should revert and the trust terminate. The state, and not the governor thereof, was the trustee, and the granting act defined how and in what manner the state, as trustee, by and through its legislature, should dispose of said land. Looking to the purpose and object sought to be effected, and to the language of the joint resolution of 1862, it is perfectly clear that it was wholly insufficient, under the rule laid down in *Railway Co.* v. *McGee,* 115 U. S. 469, 6 Sup. Ct. Rep. 123, to work a reversion to the United States, even *in futuro,* of the lands granted by the act of 1856 to aid in the construction of the Ontonagon line of railroad. That resolution neither directly, positively, nor beyond all doubt or ambiguity, manifests the intention of congress to reassert title and resume possession of said lands, either at the time of its passage or at any future day. Neither did said resolution in any way authorize the land department to assert such title for the United States, or to assume any control over said lands. I am, therefore, clearly of the opinion that, in the absence of any law, state or federal, calling for or requiring the execution of the certificate and surrender made by the governor on August 14, 1870, his release of said 142,430 23-100 acres of land was void for want of authority, and that said release did not operate to revest the title to said lands in the United States, or make them again a part of the public domain of the general government. The United States did not consider that said release had any such operation or effect, for with all facts before congress the act of March 2, 1889, was passed, declaring a formal forfeiture of said lands for breach of the condition subsequent. If said release had been either valid or only voidable, congress could and would have recognized or ratified it, and thus readily have confirmed all subsequent acts of the land-office in connection therewith. This was not attempted, but a formal forfeiture was declared, and the United States then, and at that date, reasserted ownership of the land. This was clear legislative recognition of the fact that the title of the United States had not previously thereto reattached so as to make said lands the property of the government.

Again, it is disclosed in the record that, notwithstanding said release by the governor in 1870, the state, through its executive, in 1872 or 1873, disputed the validity of said release, and still asserted title to said lands, not as the beneficial owner thereof, but as trustee under the act of 1856. This claim was not only made by the state, but her board of control of railroad grants acted upon the assumption of its validity in conferring said lands upon another railroad company, which action the legislature of Michigan confirmed. Until congress passed the act of March 2, 1889, reasserting the United States' ownership of these lands, the claim asserted thereto by the state as trustee remained unsettled or undetermined by any competent authority. The United States did not by any authoritative act or declaration dispute the state's claim to the lands made after said release had been executed by its governor, nor did congress pass any "act directing the possession and appropriation of the property, or that it be offered for sale or settlement." Under such cir-

cumstances and conditions it is doubtful, upon the authority of *Newhall* v. *Sanger*, 92 U. S. 761, whether said lands were open to appropriation or selection under other grants subsequent to the act of 1856, even assuming that the validity of said release by the governor would be ultimately sustained by the courts. But, said release being invalid and void for the want of authority to execute the same, the lands were not thereby restored to the United States, and, with no title in the United States till forfeiture declared in March, 1889, it is clear that said lands were not open to selection or appropriation under grants subsequent to the act of June 3, 1856.

It is not deemed necessary to notice all the consolidations that were, from time to time, effected between the several railroad companies, or the mortgage executed by the Chicago, St. Paul & Fond du Lac Railroad Company, or the sale thereunder, and the purchase by the Chicago & North-Western Railway Company. These matters are not material, because it is manifest that the dealings and transactions *inter sese* of companies designated as the beneficiaries of said grant of 1856 could in no way change or impair the trust created by the United States, and accepted by the state, nor authorize any diversion of the lands appropriated to construction of the several lines of railroad to any other purpose or use. It is claimed on behalf of plaintiff, and was so ruled by the trial judge, that the effect of the state's act of February 14, 1857, was to vest the legal title to the lands granted to aid in the construction of the line of road from Ontonagon to the Wisconsin state line in the Ontonagon & State Line Railroad Company; that such legal title by consolidation passed to the Chicago, St. Paul & Fond du Lac Railroad Company; thence to the Chicago & North-Western Railway Company, by whom it was surrendered to the state under the release of June 17, 1870, and from the state to the United States by the governor's certificate and surrender, executed August 14, 1870. We have already seen that said release of the governor did not operate to revest the title to the lands in question in the United States; nor is the position correct that under the operation of the act of February 14, 1857, the legal title to the lands granted for the benefit of the Ontonagon line of railroad was vested in said Ontonagon & State Line Railroad Company. The legal title was essential to the trust which the state accepted, and the granting act never authorized the legislature of the state to convey or pass the legal title to said lands to said company. The scheme of the trust created by congress clearly contemplated that the state, as trustee, should hold and retain the legal title to the lands, and the fourth section of the granting act prescribed the time and manner in which said lands should be disposed of by the state as trustee. The object and purpose of the state act of February 14, 1857, was to accept the trust and to designate the companies which might, by completing the several railroads, become the beneficiaries of the trust-estate. Said act only conferred upon the respective companies therein named the right to earn the lands, or the proceeds thereof, appropriated to them, respectively. When the lands were selected for the respective lines, the secretary of the interior, after having approved

such selection, certified the same to the state, and not to the several rail-road companies. The act of June 3, 1856, was a grant *in præsenti* to the state, and passed the title to the said sections of land along the designated lines of road. Upon the location of said roads, and the selection of the sections, and their certification by the department to the state, the legal title thereto was completely vested in the state as trustee. The disposal thereof, for the purposes specified as the trusts indicated, was left with the legislature, but the manner, and only manner, of such disposition, was prescribed. That manner did not contemplate or authorize the trus-tee to grant or convey the legal title direct to the several railroads whose construction was intended to be aided. While the act of February 14, 1857, employs some language which might purport to grant the lands to the several companies, the clear object and purpose of that act was, after accepting the grant, to confer upon the several companies designated the rights, powers, privileges, and benefits which were intended for their respective lines by the act of congress. They were the designated bene-ficiaries of the trust, with the legal title retained in the state as the trustee. This is made clear by reference to the act of the legislature, approved March 8, 1865, (page 98, H. R. Grant,) which provided for the issuance of patents for railroad lands whenever the company or companies should become legally entitled to such lands. The patents to be issued were to be *prima facie* evidence of title; but such patents, conveying the title, were only to be issued as the companies, respectively, finished and put in running order any section or sections of 20 continuous miles of their line of road. If the title had already passed by the act of 1857, this act of 1865 was idle and inoperative; but, aside from this, it is settled by the decision of the supreme court in the case of *Schulenberg* v. *Harriman*, 21 Wall. 50, 59, that the state, under the terms of the grant from con-gress, had no authority to dispose of land beyond 120 sections, except as the road, in aid of which the grant was made, was constructed. In the present case no portion of the road was built. The legal title to the lands in question did not, therefore, pass to the Ontonagon & Wisconsin State Line Railroad Company by the act of February 14, 1857, but re-mained in the state.

Was that legal title ever acquired by the plaintiff, or those under or through whom it claims? I am clearly of the opinion that it was not. The acts of March 3, 1865, and July 3, 1866, under which plaintiff de-rives its rights, whether considered and construed *in pari materia* or not, did not and could not confer upon it a legal title to the land in contro-versy. The act of 1866, treated as an independent grant, not controlled by the act of 1865, as to the location of the lands granted to aid in the construction of the Harbor & Ship Canal at Portage Lake, was the one under which plaintiff asserts its claim to the land in litigation, the same being a part of the 142,430 23-100 acres granted the state in 1856, for the benefit of the Ontonagon & Wisconsin State Line Railroad, and cer-tified to the state by the land department, in December, 1861. The act of July 3, 1866, was a grant *in præsenti* to the state. It covered and embraced 150,000 acres of land to be selected from alternate odd-num-

bered sections, and 50,000 acres from even-numbered sections, of the lands of the United States. Upon its acceptance of the grant, on March 27, 1867, there passed to the state at that time, if not at the date of the grant, the title to 200,000 acres of the designated sections of public lands, to be afterwards selected and located, which selection and location would simply operate to perfect the grant, to identify the lands covered by it and give precision to the title, and by relation have the same effect upon the selected sections as if the grant had specifically described them. It admits of no question that this grant of 1866 was not intended to cover or convey to the state lands which had been previously granted by the act of June 3, 1856. It did not, either in express terms or by any implication, attempt to make any new appropriation of the lands granted by the act of 1856. The purpose of the act of July 3, 1866, as well as its legal effect and operation, was to grant to the state, for the benefit of the canal company, 200,000 acres of public lands, remaining at the disposal of the United States. That the lands granted to the state by the act of June 3, 1856, to aid in the construction of the Ontonagon & State Line road, and which were identified by selection and certification in 1861, did not and could not again pass to the state by the act of July, 1866, for a different purpose, the United States not having declared any forfeiture, or reasserted ownership thereof for breach of condition subsequent, is too clear for argument, as it is settled by an unbroken line of authorities. See *Wilcox* v. *Jackson*, 13 Pet. 498; *Eldred* v. *Sexton*, 19 Wall. 189; *Railroad Co.* v. *U. S.*, 92 U. S. 733; *Newhall* v. *Sanger*, Id. 761; *Glasgow* v. *Baker*, 128 U. S. 560, 9 Sup. Ct. Rep. 154; and *Johnson* v. *Ballou*, 28 Mich. 379. If the United States had forfeited the grant of 1856, and reasserted their title to these Ontonagon lands before the canal company made its selection of odd sections under the grant of 1866 from or out of said lands, it is probable that such location and appropriation would have been valid under the authority of *Ryan* v. *Railroad Co.*, 99 U. S. 382. But, the title to the 142,430 23-100 acres of clear lands on the Ontonagon line not having been restored to the United States, but remaining in the state, the attempt to select about 15,000 acres from said lands, and appropriate the same to the grant of 1866, was without any authority of law, and wholly invalid. When the grant of 1866 was accepted, the state occupied the position of trustee under two separate, distinct, and clearly defined trusts. It held the title to 142,430 23-100 acres under the grant of 1856 for one exclusive purpose. It also held the title to 200,000 acres of other and different lands for another beneficiary. Both trusts were created by a common grantor. Without the consent of the United States, expressed in some authoritative way, and the consent of the *cestui que trust*, how or upon what principle of law could the state divert the lands applicable to one trust or object and appropriate them to another and different object or trust? The mere statement of the question is sufficient to show that such a proceeding would violate every principle of the law of trusts. The state could not possibly, by any action of its officials, or even of its legislature, have conferred the Ontonagon lands, or any portion thereof, upon the

canal company. This is well settled by the authorities. *Schulenberg* v. *Harriman*, 21 Wall. 44; *Johnson* v. *Ballou*, 28 Mich. 397. But the state never in fact directed or attempted any such breach of trust. Gov. Crapo, in appointing T. J. Avery (then the president of the canal company) the agent of the state to select the 200,000 acres granted by the act of July, 1866, directed said Avery to make said selection from any lands in the Upper Peninsula that were subject to private entry. Under date of May 3, 1876, the commissioner of the land department instructed the register and receiver at Marquette that—

"In satisfying the claim under said act of 1866, we are restricted to the region of country contemplated by the act of 1865 and embraced by the withdrawal above mentioned. Consequently the selections from odd sections to make up the 150,000 acres, and from even sections to cover the 50,000 acres, are necessarily restricted to that portion of your district."

Withdrawals of public lands in the Upper Peninsula were made to satisfy said grant of 1866. The president of the canal company, acting also as the agent of the state in selecting the lands under said grant, in May, 1871, selected about 15,000 acres out of said grant of 1856 for the Ontonagon & Wisconsin State Line road, and the same were by the land department or commissioner approved to the state of Michigan on May 22, 1871, for the benefit of said canal company. Conceding to this certification the force and effect of a patent, it was void, because the lands had been previously granted and appropriated, and were thereby removed or withdrawn from the jurisdiction of the land department, and not subject to its authority or control. No right or title was thereby conferred upon or vested in the canal company to said lands. This is settled by numerous authorities. *Stoddard* v. *Chambers*, 2 How. 285; *Bissell* v. *Penrose*, 8 How. 317; *Minter* v. *Crommelin*, 18 How. 87–89; *Easton* v. *Salisbury*, 21 How. 426–432; *Reichart* v. *Felps*, 6 Wall. 160; *Morton* v. *Nebraska*, 21 Wall. 660; *Shepley* v. *Cowan*, 91 U. S. 330; *Sherman* v. *Buick*, 93 U. S. 209; *Smelting Co.* v. *Kemp*, 104 U. S. 636; *Steel* v. *Refining Co.*, 106 U. S. 447, 1 Sup. Ct. Rep. 389. These cases, with others that might be cited, establish the general principle that a patent issued by the executive department of the government for lands previously granted or disposed of, or otherwise appropriated, or reserved from sale by congress, is inoperative to pass any title for want of jurisdiction over the subject and authority of law to execute the conveyance. The rule is especially applicable where the United States have by previous act of congress granted the lands which thereafter, and while such grant is in force, cease to be public lands of the government, subject to the control or disposing power of the land department. The lands selected and appropriated to the Ontonagon line in 1861, under the grant of 1856, not having been restored to the public domain, as already shown, were not subject to selection and certification for the canal company in 1871, and the act of the department in permitting such selection, and in approving the same, was wholly without authority of law, and void, and communicated no title, legal or equitable, to the canal company. But it is urged on behalf of plaintiff that said certification by the department, to-

gether with the action of the governor in certifying to the completion of the canal under the state act of March 8, 1865, conferred upon the canal company a *prima facie* title to said 15,000 acres of land, which cannot be collaterally questioned, disputed, or attacked, by the defendant, because he does not connect himself with the title, or show any interest in the land, but is a mere intruder or trespasser. Cases are cited which, at first sight, apparently support this position; but, when carefully examined, they are not applicable to this case. The decisions relied on establish the general rule that where the land granted or approved for selection or entry is part of the public domain of the United States, over which the executive or land department has jurisdiction, or may lawfully exercise a discretion, or in respect to which the law invests it with "*quasi* judicial" functions, a patent or certificate issued for such lands, although irregularly and erroneously issued, cannot be collaterally attacked in an action of ejectment by a defendant, who is a mere trespasser or intruder. In such cases the power or authority of law to issue the patent exists, and irregularities or mistakes in its exercise cannot be taken advantage of by a defendant at law who does not connect himself in any way with the title, or show any right to the land. But the present case does not come within that rule. Here the lands attempted to be conveyed or patented were not a part of the public domain of the government, and the land department had no power or authority of law to dispose of them; nor was it vested with any discretion or jurisdiction over them. Its action in certifying the land to or for the canal company was therefore not merely irregular or voidable, but was absolutely void, and wholly inoperative to confer any right or pass any title. In cases of the latter character the defendant in ejectment may always attack the plaintiff's title, or show an outstanding title in another. This is settled by the following cases: *Polk's Lessee* v. *Wendal*, 9 Cranch, 87; *Patterson* v. *Winn*, 11 Wheat. 381; *Minter* v. *Crommelin*, 18 How. 87–89; *Reichart* v. *Felps*, 6 Wall. 160; *Smelting Co.* v. *Kemp*, 104 U. S. 641, 646; *Steel* v. *Smelting Co.*, 106 U. S. 447, 1 Sup. Ct. Rep. 389; *Reynolds* v. *Mining Co.*, 116 U. S. 687, 6 Sup. Ct. Rep. 601; *Doolan* v. *Carr*, 125 U. S. 618, 8 Sup. Ct. Rep. 1228. In the two last cases the chief justice dissented from the opinion and judgment of the court, on the express ground that the defendant, being a mere intruder, could not collaterally question or attack the *prima facie* title which the patent conferred upon the plaintiff. But the court held otherwise upon the distinction above indicated, which is founded upon the well-established rule that in the United States courts a recovery in ejectment can be had only upon the strength of the plaintiff's own title, which must be the strict legal title. *Proprietary* v. *Ralston*, 1 Dall. 18; *Watts* v. *Lindsey*, 7 Wheat. 158; *Foster* v. *Mora*, 98 U. S. 425; *Reynolds* v. *Mining Co.*, 116 U. S. 687, 688, 6 Sup. Ct. Rep. 601; *Johnson* v. *Christian*, 128 U. S. 374–382, 9 Sup. Ct. Rep. 87. The governor's certificate as to the completion of the canal, in pursuance of the state act of March 8, 1865, did not and could not operate either to confirm or give any validity whatever to the void act of the land department in approving or certifying to the

state, for the benefit of the canal company, said 15,000 acres of land previously granted and appropriated to the construction of the Ontonagon & Wisconsin State Line Railroad.   But it is insisted by counsel for the plaintiff, and the trial judge so ruled, that, as the agent appointed by the state selected said lands for the canal company, which selection was approved by the land department and certified to the state for the benefit of said company, and the governor thereafter, under the authority of said act of 1865, certified to the completion of the canal, the state of Michigan is or would be estopped from disputing or denying the title of plaintiff thus acquired, and that this estoppel against the state will preclude the defendant from setting up any such outstanding title to said lands in the state.

It is not deemed necessary to enter upon any review of the authorities upon the question of when or under what circumstances the doctrine of estoppel may be invoked against the sovereign.   The government is not ordinarily bound by an estoppel.   *Johnson* v. *U. S.*, 5 Mason, 425; *Carr* v. *U. S.*, 98 U. S. 433.   Individuals may be estopped by unauthorized acts of their agents apparently within the scope of their agency, but the government is rarely, if ever, estopped by the unauthorized acts or declarations of its agents.   But if the state can ever be estopped by the unauthorized acts or declarations of its agents or officers, the facts of the present case do not call for or warrant the application of the doctrine. The canal company was not misled to its injury by any act of the state or its officials.   Its own officer acted in violation of his instructions from the governor in selecting said lands.   The company knew the lands had been previously granted, was affected with full notice of the public acts of congress, of the land department, and of the state in relation thereto, and assumed to act for itself in selecting what it could not legally appropriate.   The state was guilty of no deception or fraud in leading the company to select said lands.   To make the doctrine of estoppel apply to title to real estate the party invoking its aid must not only be misled to his hurt, but he must also be destitute of knowledge of the true state of title, and also of the means of acquiring such knowledge.   *Brant* v. *Coal, etc., Co.*, 93 U. S. 326.   The canal company does not bring itself within this rule.   It was not misled, and it knew the state of the title.   But for another and still stronger reason the doctrine of estoppel can have no application to this case.   An estoppel can never exist where the party, whether an individual, a corporation, or a government, against whom it is invoked, has no power or legal capacity to lawfully and directly do the act, which is sought to be confirmed by precluding its denial.   It is an essential element in the legal principle on which the doctrine of estoppel rests that the party against whom it is asserted should have possessed the authority or power or legal capacity to have directly done the act in some lawful way.   It was not within the power or legal capacity of the state, as trustee, to have appropriated the lands in question to the canal company, or to have vested it with the title thereto; and no act or declaration of the state officials can estop the state from denying what it had no authority to do, directly.   Upon the whole case, the conclusions

of this court are (1) that the title to said lands was not restored to the United States, nor were said lands made public domain until the passage of the forfeiture act of March 2, 1889; (2) that no title thereto was ever acquired by the canal company by the acts and transactions which preceded said forfeiture act of congress; (3) that the defendant, even as a mere intruder, and aside from any right acquired under said act of March 2, 1889, may and has successfully disputed plaintiff's *prima facie* title arising from the certification thereof for its benefit; and (4) that there is no estoppel either upon the state or the defendant against disputing or denying the validity of such *prima facie* title. It results in the judgment of this court that there should be a new trial in this case, at which the plaintiff will have to claim a confirmation of its title, to the exclusion of defendant's right, from the act of March 2, 1889, the construction and legal effect of which is not now passed upon.

BROWN, J., (*concurring.*) Having sat with my brother judges during the argument of this case, I am requested by them to express my views upon the questions involved. The limited time at my disposal, and the urgency of business in my own district, forbid my entering into a lengthy discussion of the various points, or doing much more than to announce my general conclusion. Having had recent occasion in the case of *Shepard* v. *Insurance Co.*, 40 Fed. Rep. 341, to examine the original railroad land grant act of June 3, 1856, I was of the opinion:

1. That the act was a present grant of lands, included in its terms, to the state, and that no further conveyance by the government was contemplated. *Schulenberg* v. *Harriman*, 21 Wall. 44; *Johnson* v. *Ballou*, 28 Mich. 379.

2. That, while the act passed the title to these lands to the state, such divestiture of title did not operate as to any particular lands until they had been selected and certified to the state.

3. That the state took the title to such lands as trustee for the railroads named in the first section of the act, and for no other purpose whatsoever.

4. That the provision in the act that all lands remaining unsold for 10 years should revert to the United States, if the roads were not then completed, was a condition subsequent, and that upon breach of such condition such lands would not revert to the United States without judicial proceedings authorized by law, or a forfeiture asserted by legislative act.

5. If the question, how many railroads were contemplated by this act? depended for its solution solely upon the language of the act itself, there would be strong reason for holding that they were limited to three, viz., one in the Upper Peninsula, one from Amboy and Grand Rapids to Traverse bay, and one from Grand Haven and Pere Marquette to Port Huron, by the way of Flint. But in view of the act of acceptance by the legislature of February, 1857, whereby the lands in the Upper Peninsula were conferred upon four separate roads, and in view of the subsequent action of the federal government in connection therewith, I think

the act should be construed as authorizing the formation of corporations for the construction of separate roads from Marquette and Ontonagon to the state line. It is true, the two roads from Marquette and Ontonagon, upon which a portion of the lands was conferred by the legislature, were consolidated with the Chicago, St. Paul & Fond du Lac Railroad, and thus became one corporation, and that this road filed two maps with the commissioner of the general land-office, one of which was from Fond du Lac through Wisconsin to the Michigan line, and the other of which was from Marquette and Ontonagon to the state line, and in his acceptance of these maps the commissioner of the land-office speaks of these as one road with separate branches from Ontonagon to Marquette; yet the subsequent dealings, for several years thereafter, were wholly with the Marquette line, which was treated as a separate and distinct road. After the acceptance of these maps nothing further appears to have been done until the foreclosure of the mortgage given by the Chicago, St. Paul & Fond du Lac Railroad, including its right to these lands, and the purchase of its rights and franchises by the Chicago & North-Western. From this time forward the line from Marquette to the state line appears to have been treated as a separate road. The Michigan legislature, by the act of 1861, after reciting the insolvency of the Fond du Lac Railroad, enacted that the lands appropriated to the construction of such road be placed in charge of the board of control, with power to confer them upon some other competent company for the construction of such road. The commissioner of the general land-office, in December of that year, certified to the state 112,145 acres "to aid in the construction of a railroad from Marquette to the Wisconsin state line, and known as the 'Chicago, St. Paul & Fond du Lac Railroad,'" and at the same time certified to the state 142,430 acres "to aid in the construction of a railroad from Ontonagon to the Wisconsin state line, and known as the 'Chicago, St. Paul & Fond du Lac Railroad.'" In April of the following year the board of control, acting under the authority of the legislative act of the preceding year, (1861,) and with the consent of the Chicago & North-Western Railroad, which had succeeded to the rights of the Fond du Lac road, recommended and requested that congress authorize the relocation of the lands granted for the purpose of the road from Marquette to the state line, so as to conform to the new line adopted by the Peninsula Railroad Company, and ordered that all the lands, etc., granted by congress to aid in the construction of the railroad from Marquette to the Wisconsin state line should be conferred upon the said Peninsula Railroad Company. In compliance with such request, congress, by joint resolution of July 5, 1862, authorized the relocation of the line of railroad from Marquette to the state line, with the provision that the governor should certify that the state had surrendered all its claim to the lands originally certified. In such case the state was entitled to receive a "like quantity of land selected in like manner upon the new line." If any doubt had previously existed as to the proper construction to be given to the act of 1856, I regard it as settled by this joint resolution, which, in my view, contemplated a distinct line of road from Marquette

to the.state line. . Thereupon the Peninsula Railroad released to the ,United States the original land granted to the Marquette & State Line Railroad, and became consolidated with the Chicago & North-Western. A joint resolution of the legislature also authorized the governor to execute a certificate of non-incumbrance and surrender of the lands on the original line of the Marquette & State Line Railroad, but made no mention of the Ontonagon line. This surrender was executed by Gov. Crapo in 1866. During all this time the grant to the Ontonagon line had remained in abeyance, nothing having been done since 1857, when the maps were filed and the land certified to the state. On' July 13, 1868, the commissioner of the general land-office, in a letter to the solicitor of the Chicago & North-Western Railroad, called his attention to the lands "for the branch line to Ontonagon," and requested the State Line Railroad Company to execute a release of such lands. And thereupon the governor,. on August 14, 1870, acting upon the opinion of the attorney general, executed a similar surrender and release of the lands certified to the state for the benefit of the Ontonagon line.

6. I think this release, not having been authorized by any act of congress or the state legislature, was a nullity, and the trust created by the original act of 1856 remained unimpaired until the right of the state to these lands was forfeited by judicial or legislative act. I do not understand that the governor of the state has any general power, by virtue of his office, to convey lands held by the state, either in fee-simple or in trust for another. His only authority to release lands vested in the state by the original act of 1856 was limited to the lands originally selected for the construction of the line from Marquette to the Wisconsin state line. The letter of July 13, 1868, from the commissioner of the land-office, would seem to indicate that he considered the Ontonagan line as a mere branch of the line to Marquette, when in fact these lands had been allotted to a distinct corporation. Three years thereafter Gov. Bagley, who had succeeded Gov. Baldwin, in a communication to the secretary of the interior, called his attention to the action of his predecessor, and claimed that the surrender of these lands was without authority of congress or the legislature, and requested that they be withheld from sale. Upon receipt of such letter, the restoration of these lands to sale was suspended, an investigation was had, and the secretary of the interior came to the conclusion that his predecessor had erred in demanding a release of the lands granted for the Ontonagon line, and was of the opinion that the title was still in the state of Michigan. Thereupon, and in 1880, the Ontonagon & Brulé River Railroad Company was organized for the purpose of constructing a road from Ontonagon to the state. line', and the board of control declared the lands forfeited to the state, and vested the same in the newly organized company.

7. In March, 1889, no steps having been taken to build the road, congress passed an act forfeiting to the United States and resuming title to all lands granted by the act of 1856 "opposite to and coterminous with the uncompleted portion of any railroad to aid in the construction of which said lands were granted," and all such lands were declared to

be a part of the public domain. Then, for the first time, these lands became subject to private entry. Long prior to this act, and in 1871, the canal company, through P. J. Avery, its agent, acting under authority of a certain act of congress passed in 1866, making grant of "lands of the United States" for the construction of the Portage lake ship canal, selected 15,000 acres of these lands originally reserved for the building of the Ontonagon & State Line road. This, like the act of 1856, was a grant *in præsenti,* and in the uniform construction given such grants by the supreme court did not operate to convey lands which had been previously appropriated for other purposes, or the title to which was not at the time of the selection then in the United States. I see no escape from the conclusion that the selection of these 15,000 acres, the title to which was then in the state, was void, and the canal company took no title to the lands. I see no evidence of fraud on the part of the company or its agent in making the selection, as they seem to have relied upon the legality of the release executed in 1870; and, if the governor had had authority to make the surrender and release of the lands appropriated to the Ontonagon line, I see no reason why the canal company would not have taken a perfect title to them. Nor do I see any reason for imputing fraud to the state. The act of the governor, on releasing these lands, was undoubtedly *bona fide,* and was done after consultation with his official adviser, the attorney general. I have given my reasons for believing that he was mistaken; but his act was simply in excess of his authority, and is not imputable to the state. The state itself, acting through its authorized voice, the legislature, was simply silent, doing nothing to affirm or disaffirm his conduct. When the land grant was made in aid of the ship canal company, the lands were conferred by the legislature upon the Portage Lake & Lake Superior Ship Canal Company, subject to all the conditions of the original grant. But there was no attempt by the legislature to interfere with lands already granted in aid of the railroad, or to dispossess it of the title it might acquire by building the road. Mr. Avery, in selecting such lands, was apprised of the state of the title, and took the risk of the legality of the governor's action. Had the state, in 1871, held the title to these lands in fee-simple, there could be no doubt of its power to confer them upon the canal company; but holding them a trustee for a special purpose, it had no right to divert them from that purpose, and grant them to another for a different purpose. The governor, the board of control, and the commissioners of the general land-office, are simply the agents for certain purposes of their respective sovereignties, and possess no powers not conferred by general statutes or special enactments; and I know of no legal principle by which the state or general government can be estopped by the acts of their officers in excess of their authority.

8. I do not think that the act of forfeiture of 1889 inured to the benefit of the canal company; that the act was a complete forfeiture of the right of the state to hold the lands for any purpose. It cut off all right which the state then had to these lands, but it conferred no title upon the canal company, and left this company standing in the position of a

naked trespasser. The act of 1866 did not confer these lands upon the state, because the grant was limited to lands then belonging to the United States, and the state never received a subsequent title to these lands which would inure, by way of estoppel, in favor of the canal company. In the case of *Railroad Co.* v. *U. S.*, 92 U. S. 733, it is said of a land grant act similar in its terms to the act of 1866 that the state takes an immediate interest in the lands whereto the complete title is in the United States at the date of the act; but if they are at that time reserved for any purpose whatever, they are excluded from the operation of the act, and it is immaterial whether they subsequently become a part of the public lands of the country. A subsequent sale and grant of the same lands to another person is absolutely null and void so long as the first appropriation continues in force. *Simmons* v. *Wagner*, 101 U. S. 260.

9. Can the defendant, who shows no title to these lands in himself, and who, for aught that appears, is a mere trespasser, set up this title in the state, when the state itself has conferred title upon the plaintiff? This is the most difficult question in the case, and one which caused considerable embarrassment in the *Shepard Case*, although I finally held, in that case, that, as both parties claimed title under the act of 1856, the doctrine of common source applied, and neither could set up against the other a title antedating that act. The general rule in actions of ejectment is that the defendant may show an outstanding title in a third person. Does this rule apply in this case? The decisions of the supreme court upon this point are, to a certain extent, misleading, and while there may be no direct conflict between them, there are certain expressions in some of the opinions which indicate that the point had not received attentive consideration from the justice who delivered the opinion. In discussing this question we are bound to assume that the grant to the canal company was void, for the reason that the state had no title to the thing granted, as stated in *Polk's Lessee* v. *Wendal*, 9 Cranch, 87. It was said of this case, in *Patterson* v. *Winn*, 11 Wheat. 384, that it had settled the doctrine of this court "that if a patent is absolutely void upon its face, or the issuing thereof was without authority, or was prohibited by statute, or the state had no title, it may be impeached collaterally in a court of law in an action of ejectment." It would be mere waste of time, however, to examine and distinguish all the cases upon this point, since all of them were subjected to a searching criticism in *Doolan* v. *Carr*, 125 U. S. 618, 8 Sup. Ct. Rep. 1228, and the conclusion reached that if officers of the government act without authority —

"If the land which they purported to convey had never been within their control, or had been withdrawn from that control at the time they undertook to exercise such authority, then their act was void for want of power in them to act upon the subject-matter of the patent, not merely voidable."

In *Reynolds* v. *Mining Co.*, 116 U. S. 687, 6 Sup. Ct. Rep. 601, the rule is stated somewhat differently,—that in all actions, to recover possession of real estate, the plaintiff can only recover on the strength of his own title, and not on the weakness of the defendant's title. On the other hand, if the patent has been obtained by fraud, it can only be

set aside by a bill in equity at the suit of the United States; and private persons, particularly in a suit at law, are in no position to attack its legality.   So, if an executive officer of the government is vested with *quasi* judicial function to determine what lands shall pass in respect to their character, his determination is the only criterion of ascertainment, and cannot be impeached.   *Steel* v. *Refining Co.*, 106 U. S. 447, 1 Sup. Ct. Rep. 389; *Doll* v. *Meador*, 16 Cal. 295.   In *Doolan* v. *Carr* the land was patented to a railroad company, February 28, 1874, and the railroad company conveyed to Carr, the plaintiff, June 10, 1874.   No attempt was made by the United States to annul the patent.   On the 10th of November, 1882, the defendant Doolan and one McCue each entered on 160 acres, under a claim of pre-emption settlement.   Each of them then made and subscribed a declaratory statement of his intention to claim and pre-empt the land on which he had settled, under the laws of the United States, and presented it to the register of the proper land-office; but he refused to receive it, on the ground of the existence of a patent to the railroad company.   The position assumed by the chief justice, in his dissenting opinion, is practically the same as that occupied by the plaintiff in the case under consideration.   The principal cases upon which he seemed to rely were *Hoofnagle* v. *Anderson*, 7 Wheat. 212, in which an attempt was made by a private individual to attack the patent upon the ground of fraud and mistake, and it was held, following out the distinction above noted, that, as the patent appropriated the land, any defects in the preliminary steps required by law were cured by the patent.   Says the chief justice:

"If a patent has been issued irregularly, the government may provide means for repealing it; but no individual has a right to annul it, to consider the land as still vacant, and to appropriate it to himself."

In other words, the patent in that case was not void, but voidable, and it could only be avoided by a suit brought by the government for that purpose.   In *Cooper* v. *Roberts*, 18 How. 173, the plaintiff claimed that his land had been allotted to the state of Michigan for the use of schools, while the defendant relied upon a license given by a mineral agent, and objected that the officers of the state violated the statutes of Michigan in selling these lands after they were known, or might have been known, to contain minerals.   It was held that the defendant was not in condition to raise this issue, and the patent was held conclusive of the fact of a valid and regular sale.   This is not the case of a patent located upon lands previously reserved for another purpose.   In *Field* v. *Seabury*, 19 How. 323, it was held that a third party cannot raise in ejectment the question of fraud as between the grantor and grantee, and thus look beyond the patent or grant.   A similar ruling was made in *Spencer* v. *Lapsley*, 20 How. 264.   In line with these cases is that of *Ehrhardt* v. *Hogaboom*, 115 U. S. 67, 5 Sup. Ct. Rep. 1157, in which it was held that oral evidence was inadmissible on the part of defendant to show that certain lands were not open to settlement under pre-emption laws, but were swamp and overflowed lands, which passed to the state under another act; the court holding it to be the duty of the land de-

partment to determine whether land patented to a settler is of the class subject to settlement under pre-emption laws, and that its judgment upon this fact was not open to contestation, in an action at law, by a mere intruder without title. In *Frisbie* v. *Whitney*, 9 Wall. 187, a certain Mexican grant having been declared to be invalid, a rush was made to pre-empt the lands covered by the grant, and it was held that such pre-emption, accompanied by force, was not valid to oust the title of one already in possession of the land. The case evidently turned upon the fact of the actual occupation of the land by the one party and his forcible dispossession by another party. The defendant, in the case under consideration, stands practically in the same position as the defendant in *Doolan* v. *Carr*. He took possession under a claim of right to the benefit of the pre-emption or homestead laws of the United States, and his claim was rejected upon the ground that the lands had been previously patented to the canal company. It seems to me this case cannot be distinguished from *Doolan* v. *Carr*, and that the principles announced by the majority of the court in that case apply with equal force here.

SEVERENS, J., (*dissenting.*) A verdict and judgment having passed for the plaintiff upon the trial of this cause at the last May term of this court at Marquette, a motion for a new trial was entered, and was heard in the autumn by the circuit and district judges sitting together. Very full and elaborate arguments were made on both sides, and much assistance has been thereby afforded. I have given careful attention to these arguments and to the authorities referred to by counsel in their support, and after much reflection upon the case am of the opinion that the verdict and judgment are right. The court was in error in the proposition stated at the trial, that the act of the legislature of Michigan of February 14, 1857, conferring the lands granted by the act of congress of 1856 upon the several corporations therein mentioned, operated to transfer the legal title. But I am of opinion that the precise nature of the rights conferred is not material to the proper determination of the present controversy, in the view which I think should be taken of the principal facts and their consequences. It is a question of grave doubt whether congress intended by the act of 1856 to provide for two distinct railroads from Marquette and Ontonagon to the Wisconsin state line, rather than one having branches to each of the former termini. The words descriptive of that proposed railroad are grouped together. In the contemporary act, granting lands to the state of Wisconsin, upon which the case of *Schulenberg* v. *Harriman*, 21 Wall. 44, arose, the grant was declared to be for the purpose of aiding in the construction of a railroad from Madison or Columbus, by way of Portage City, to the St. Croix river or lake, and from thence to the west end of Lake Superior and to Bayfield. The latter place is upon Lake Superior, and some 60 miles east of Superior City, at the west end of Lake Superior. Marquette and Ontonagon, also on Lake Superior, are about 90 miles apart. A diagram of the line of this Wisconsin railroad is shown on page 46 of 21 Wallace. Obviously the line contemplated by that act was a unit, although branches would

be necessary to reach the two northern termini. The act of the state legislature, in apportioning the grant to different companies, does not appear to me to be of consequence in the construction of the granting act. Congress did not concern itself with that, and the state was at liberty to constitute one, two, or more companies to build railroads on any parts of the lines of roads as it might think expedient. And while the lands were originally conferred on two corporations, yet when they were actually located and certified, there was but one company, the originals having been absorbed by consolidation under the laws of the state. As a matter of fact, however, two distinct lines were never located southward to the Wisconsin state line, but part of the way only, and then in common. It is true that as located the single part of the line was shorter than either branch. But there was nothing in the act of 1856 to prevent the point of junction being located much further to the north with branches starting off more nearly at right angles. It seems to me, therefore, that there was strong reason for holding, as the department of the interior appears to have done, that the line of railroad contemplated by the act of 1856 was regarded as an entirety, and that for these reasons, and inasmuch as the change of the location of that part of the line running from Marquette to the Wisconsin state line to the new line contemplated by the act of 1862 would swing the southern part of the railroad entirely out of all relation to the rest of the line, and leave the remnant without connection with it, it was probably the expectation of congress that all the lands selected for the one object of the grant of 1856 would be surrendered. Nor do I think that the doctrine stated and applied in *Railway Co.* v. *McGee*, 115 U. S. 469, 6 Sup. Ct. Rep. 123, that a forfeiture must be indicated by express or unequivocal language of congress in order to work a resumption, has application here. The act of 1862 was not an act for forfeiture, but was in the nature of contract dealing, and in my opinion should be construed by the rules applicable to such. It can hardly be doubted that congress understood, when the act of 1862 was passed, that the granted lands for this road had been selected by and certified to the one railroad company, which had become possessed of all the franchises of the entire road. The interior department, in consideration of the reasons before it, held that the act contemplated a surrender of all the lands which had been certified to it for the entire road, and required such surrender before it would certify the lands selected in exchange. If that decision was correct, it would seem to end the question. But if this holding of the land department is now adjudged to have been erroneous, it remains to consider what has been done upon the footing of it and the consequences resulting therefrom. At a date subsequent to the time when these lands became subject to forfeiture they were surrendered by the beneficiary to the state, and by the executive of the state, and under the seal thereof, they were surrendered to the United States in accordance with the requirement of the executive department of the latter and the request of the railroad company. The state thereafter selected a part of the lands thus surrendered, under the canal grant, and bargained them to the canal company as the con-

sideration for the construction of that work. That selection was made by the officer designated by the act of congress to represent the state. It is not material that the lands were not a part of the grantable lands of the government at the date of the act. *Ryan* v. *Railroad Co.*, 99 U. S. 382. The canal grant was not a grant of any particular lands. It was floating until it attached·upon these lands by the selection of the state and the approval of the interior department. In the language of the court in *Cooper* v. *Roberts*, 18 How. 173, 179, "the *jus ad rem*, by the performance of that executive act, became a *jus in re*, judicial in its nature." By the method prescribed by congress, and the only means by which the state could acquire a fixed interest in any land, these lands were selected by the state, and by the method prescribed by the state itself they were bargained and certified to the canal company for a valuable consideration, and that consideration fully paid. This was before any complaint or criticism about the surrender had been made in any quarter. Subsequent to the surrender by the state to the United States, and prior to 1889, a very large proportion of the whole body of lands thus surrendered on the·Ontonagon branch has been sold and patented by the United States to private individuals, and during that period of 18 years the legislative department of the government did nothing to indicate any disapproval of what had been done in its behalf. If the legislative department was content with what had been done by the executive in resuming control of these lands, there was no occasion to take action. Neither a legislative declaration nor a judicial forfeiture is necessary when the grantor has acquired actual dominion and control of the land granted upon condition. *Fitchet* v. *Adams*, 2 Strange, 1128; *Hamilton* v. *Elliott*, 5 Serg. & R. 375; *Andrews* v. *Senter*, 32 Me. 394; *Willard* v. *Henry*, 2 N. H. 120; *Rollins* v. *Riley*, 44 N. H. 9, 13.

I do not think there is anything inconsistent with this in what the supreme court has held upon the subject of forfeiture. There was no fraud on the part of the canal company in selecting these lands. All was done publicly, and with the concurrence of the executive of the state and the secretary of the interior, and there is nothing to impeach the *bona fides* of all concerned in that selection. There was nothing unusual or wrong in the canal company being active in selecting the lands. That was reasonable and proper. The lands which might otherwise have been selected, and were valuable, are now in great measure sold or appropriated. The defendant, who is a mere intruder, entirely without right or any possible way of obtaining any upon his own theory, asks the court to hold that all that has been done is utterly void, and gives the plaintiff no title whatever. This he asks not to protect any interests of his own, but when the consequences of such holding is to overturn the foundations on which the titles of a large number of purchasers in good faith are supported. The theory of his defense is that the title of the land sued for remained in the state of Michigan, and at the date of the commencement of suit was still lodged there. But he could not set up a title in the state, if the state itself could not in case it were litigating; and in my opinion, the state could not have asserted a title to these

lands. The inclination of my judgment is to hold that the proceedings were intrinsically sufficient to revest the legal title to those lands in the United States. But, be that as it may, the state should be held concluded by its concurrence in the proceedings intended to vest the title in the canal company. It would be permitting the state to commit a gross fraud if it be not concluded. The obligations of legal morality rest certainly with as much weight upon the state as upon private individuals. This principle was applied to a municipality in the case of *Carondelet* v. *St. Louis*, 1 Black, 179, 191; to a county in *Calhoun* v. *Emigrant Co.*, 93 U. S. 124; to a state in *Com.* v. *Andre*, 3 Pick. 224. It was justly said in *Woodruff* v. *Trapnall*, 10 How. 190, 207, by the court, in delivering judgment, that we naturally look to the action of a sovereign state to be characterized by a more scrupulous regard to justice and a higher morality than belong to the ordinary transactions of individuals. And there are other cases where the supreme court has laid stress upon such circumstance when considering public action in regard to titles and property rights. In dealing with these, it does not seem to me that a state can be regarded as a merely mechanical organization, and its action in such matters be treated as unaffected by obligations which elsewhere bind the conscience. The principle has been asserted and applied in several cases in the circuit courts of the United States. *Cahn* v. *Barnes*, 5 Fed. Rep. 327; *Hough* v. *Buchanan*, 27 Fed. Rep. 328; *Pengra* v. *Munz*, 29 Fed. Rep. 830. Reference is not made here to that species of estoppel which is put upon one who by untrue assertion misleads another to·his prejudice, but to that which precludes one from taking inconsistent positions where, having taken one by which he has benefited at the expense of another, he is not permitted to repudiate that and take another inconsistent position, to the prejudice of that other. In this kind of estoppel it is not necessary that there should have been either false representations or misleading. The fraud is committed by the party being permitted to retrace his course and stand on the other ground. *Daniels* v. *Tearney*, 102 U. S. 415, and cases cited. And this defense would be a good one if the state were a plaintiff in ejectment suing for this land which had thus been appropriated by her own act. *Dickerson* v. *Colegrove*, 100 U. S. 578; *Baker* v. *Humphrey*, 101 U. S. 494; *Kirk* v. *Hamilton*, 102 U. S. 68.

In regard to the letter of Gov. Bagley, repudiating the official action of Gov. Baldwin, it seems to me, little need be said. In the writing of that letter he was not in the exercise of any duty conferred upon him by the constitution or laws of the state, or of the United States. His predecessor, in selecting these lands for the canal company, was. Gov. Bagley himself, at a later date, executed the certificate of completion to the canal company in the exercise of his proper official function. I think it can hardly be said that this was intended by the law and by the official to operate merely as denoting that the work was done. The language of the fourth section of the act of the legislature of March 18, 1865, as well as the language of the certificate itself, seem to imply that it was intended to operate as the conveyance of the title of the state in the se-

lected lands to the canal company. This seems to have been the view taken by the supreme court of Michigan in *Sutherland* v. *Governor*, 29 Mich. 320, 322, and, I think, correctly. No other mode of transferring the legal title to the canal company was provided by the law. Again, it seems to me that the courts should not measure the action of great organizations, like the state and the general government, by the square and compass of technical law, which, though well fitted to the measure and determination of private conduct and controversies, might work confusion if applied to great public transactions occurring in the past, and in reliance upon the validity of which many private rights have been founded. And legal doctrines, which might have unquestioned applicability to a simple state of facts, must often yield to impinging rules of paramount importance where, other circumstances concurring, the latter ought in the soundest reason to be applied. In the case of *Doolan* v. *Carr*, 125 U. S. 618, 8 Sup. Ct. Rep. 1228, which is much relied upon by counsel for the defendant, the circumstances were materially different from those here presented. The defendants in that case were in possession under a claim of right, which they were asserting to obtain the title to the land by the means which the law gave them. It mattered not that this right had been for the time wrongfully denied to them. If, as they offered to prove, the land was subject to entry, the denial would not finally decide their right. They, therefore, had a standing which enabled them to raise the question of the validity of the plaintiff's title. In view of other decisions of the supreme court, it seems likely that this fact must have influenced the ruling in that case. Here the defendant had no right to enter in any view of the situation. If the title was in the United States, it was by virtue of proceedings which rendered it exposed to the selection of the canal company; if it was in the state, the latter was not authorized to grant it to him. But, besides this, and, as it seems to me, of still greater importance, there was in that case no such reciprocal public action as took place here, and no such extensive private rights had been acquired upon its assumed validity. The case presented the simple grounds for the application of the doctrine there stated. Instances abound in the law where a matter of doubtful coherence becomes solid under the pressure of supervening events, and cases often arise where the maxim *quod fieri non debet factum valet* applies; and I think this is such a one, even if it be conceded that the action of the governor and the land department were based upon a mistaken construction of the acts of congress. For these reasons, I think, the defendant was not entitled to prevail with this defense, and that the result of the trial was the proper one.

The order granting the motion for a new trial was therefore entered.